REITER ET AL. *v.* COOPER, TRUSTEE FOR CAROLINA
MOTOR EXPRESS, INC., ET AL.

No. 91–1496.  Argued December 1, 1992—Decided March 8, 1993

SCALIA, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and WHITE, STEVENS, O'CONNOR, KENNEDY, SOUTER, and THOMAS, JJ., joined. BLACKMUN, J., dissented.

*Carter G. Phillips* argued the cause for petitioners. With him on the briefs were *Robert J. Gallagher* and *Rex E. Lee.*

*Michael L. Dreeben* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Starr, Deputy Solicitor General Wallace, Robert S. Burk, Henri F. Rush,* and *Ellen D. Hanson.*

*Joseph L. Steinfeld, Jr.,* argued the cause for respondents. With him on the brief were *Robert B. Walker, John T. Siegler,* and *Langdon M. Cooper.**

JUSTICE SCALIA delivered the opinion of the Court.

This case presents the question whether, when a shipper defends against a motor common carrier's suit to collect tariff rates with the claim that the tariff rates were unreasonable, the court should proceed immediately to judgment on the carrier's complaint without waiting for the Interstate Commerce Commission (ICC) to rule on the reasonableness issue.

I

In many ways, this is a sequel to our decision in *Maislin Industries, U. S., Inc.* v. *Primary Steel, Inc.,* 497 U. S. 116 (1990). The facts of the two cases follow a pattern that has been replicated many times in the era of "deregulation" following enactment of the Motor Carrier Act of 1980, 94 Stat. 793: A motor carrier negotiates with a shipper rates less than

---

*\*Rex E. Lee, Carter G. Phillips, John K. Maser III, Frederic L. Wood, Richard D. Fortin, Daniel J. Sweeney, Paul H. Lamboley, William J. Augello, Martin W. Bercovici,* and *Robert J. Verdisco* filed a brief for the National Industrial Transportation League et al. as *amici curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed for American Freight System, Inc., by *Norman E. Beal;* for the International Brotherhood of Teamsters by *Richard N. Gilberg, Babette Ceccotti, Marc J. Fink,* and *William W. Pollock;* and for Lloyd T. Whitaker as Trustee for the Estate of Olympia Holding Corp. by *Kim D. Mann.*

*Leonard L. Gumport* filed a brief *pro se* as *amicus curiae.*

the tariff rates that the Interstate Commerce Act (ICA), 49 U. S. C. § 10701 *et seq.*, requires the carrier to "publish and file" with the ICC, 49 U. S. C. § 10762. After the shipments are delivered and paid for (sometimes years after), the carrier goes bankrupt and its trustee in bankruptcy sues the shipper to recover the difference between the negotiated rates and the tariff rates. Shippers' standard defenses against such "undercharge" actions have been (1) that the carrier's attempt to collect more than the agreed-upon rates is an "unreasonable practice" proscribed by the Act, see § 10701(a), and (2) that the tariff rates were unlawful because they were unreasonably high, see *ibid.* In 1989, the ICC announced a policy approving the first of these defenses. See *NITL—Petition to Institute Rulemaking on Negotiated Motor Common Carrier Rates*, 5 I. C. C. 2d 623 (1989); see also *NITL—Petition to Institute Rulemaking on Negotiated Motor Common Carrier Rates*, 3 I. C. C. 2d 99 (1986); *Maislin*, 497 U. S., at 121–122. Our decision in *Maislin* held that policy invalid under the ICA, because it would "rende[r] nugatory" the specific command of § 10761 that the carrier charge the filed rate. *Id.*, at 133. While *Maislin* thus eliminated the shippers' "unreasonable practice" defense, it expressly noted that "[t]he issue of the reasonableness of the tariff rates is open for exploration on remand." *Id.*, at 129, n. 10. The present case presents a problem of timing that has arisen out of that issue.

The shippers here are petitioners California Consolidated Enterprises (CCE) and Peter Reiter. Between 1984 and 1986, they were engaged in the business of brokering motor carrier transportation, which essentially involves serving as a middleman between motor carriers and the shipping public. During that period, petitioners tendered shipments to Carolina Motor Express, Inc., which was operating as a certified motor carrier in interstate commerce subject to regulation by the ICC. Carolina and petitioners negotiated rates for several shipments that were lower than the applicable tariff

rates on file with the ICC. (Petitioners believed that Carolina would publish these negotiated rates in its tariffs, but Carolina never did so.)

In 1986, Carolina filed for bankruptcy and respondent Langdon Cooper was appointed trustee. Respondent Mark & Associates of North Carolina was retained to conduct an audit of Carolina's shipping bills, which revealed undercharges (below applicable tariff rates) in the amount of $58,793.03 on shipments made by CCE and $13,795.73 on shipments made by Reiter. Respondents brought adversary proceedings against petitioners in Bankruptcy Court to collect those amounts. Petitioners raised the standard "unreasonable practice" and "unreasonable rate" claims, and moved the Bankruptcy Court to stay proceedings and to refer those claims to the ICC. The Bankruptcy Court refused to do so and entered judgment for respondents. *In re Carolina Motor Express, Inc.*, 84 B. R. 979 (WDNC 1988). In 1989 (prior to our decision in *Maislin*), the District Court reversed and held that the "unreasonable practice" defense should be referred to the ICC. The Court of Appeals, after holding respondents' appeal in abeyance until our decision in *Maislin*, reversed the District Court. *In re Carolina Motor Express, Inc.*, 949 F. 2d 107 (CA4 1991). It held that, in light of *Maislin*, there was no need to refer the "unreasonable practice" issue to the ICC, 949 F. 2d, at 109; and that the "unreasonable rate" claim was no obstacle to the carrier's action, since even if the tariff rates were unreasonable the "filed rate" doctrine requires the shipper to pay them first and then seek relief in a separate action for damages under § 11705(b)(3), *id.*, at 110–111. We granted certiorari. 504 U. S. 907 (1992).

## II

The ICA requires carriers' rates to be "reasonable," § 10701(a), and gives shippers an express cause of action against carriers for damages (called "reparations" in the precodification version of the statute, see 49 U. S. C. §§ 304a(2),

(5) (1976 ed.)) in the amount of the difference between the tariff rate and the rate determined to be reasonable by the ICC, § 11705(b)(3).[1]  Respondents argue, however, that the unreasonableness of a tariff rate may not be asserted as a "defense" to an action to recover charges based on that rate. That may be true in a technical sense, since § 11705(b)(3) provides a *cause of action* rather than a *defense*.  But that does not establish that the "unreasonable rate" issue cannot be raised in the present suit, since a defendant having a cause of action against a plaintiff may—indeed, often *must*—assert that cause of action as a counterclaim.  See Fed. Rule Civ. Proc. 13; *Southern Constr. Co.* v. *Pickard*, 371 U. S. 57, 60 (1962).  Petitioners' claims under § 11705(b)(3) are certainly properly raised here, since they relate to the same shipments for which respondents seek to collect.  And it makes no difference that petitioners may have mistakenly designated their counterclaims as defenses, since Federal Rule of Civil Procedure 8(c) provides that "the court on terms, if justice so requires, shall treat the pleading as if there had been a proper designation."  See also 5 C. Wright & A. Miller, Federal Practice and Procedure § 1275, pp. 459–460 (2d ed. 1990) ("Inasmuch as it is not clear whether set-offs and recoupments should be viewed as defenses or counterclaims, the court, by invoking the misdesignation provision in Rule 8(c), should treat matter of this type as if it had been properly designated by defendant, and should not penalize improper labelling").

Under 49 U. S. C. § 11706(c)(2), a shipper "must begin a civil action to recover damages under [§ 11705(b)(3)] within two years after the claim accrues," which occurs "on delivery or tender of delivery by the carrier," § 11706(g).  That limi-

---

[1] Section 11705(b)(3) provides in relevant part:

"A common carrier providing transportation or service subject to the jurisdiction of the Commission . . . is liable for damages resulting from the imposition of rates for transportation or service the Commission finds to be in violation of this subtitle."

tation is not applicable here, however, since presented in response to the carrier's suit petitioners' claims seek merely "recoupment"—*i. e.*, the setting off against asserted liability of a counterclaim arising out of the same transaction. Recoupment claims are generally not barred by a statute of limitations so long as the main action is timely. See *Bull* v. *United States*, 295 U. S. 247, 262 (1935); 3 J. Moore, B. Ward, & J. Lucas, Moore's Federal Practice ¶ 13.11 (1992). There is no reason not to apply this principle to suits under the ICA, and we have indeed already done so. In *United States* v. *Western Pacific R. Co.*, 352 U. S. 59, 71 (1956), we held that an ICA limitation provision nearly identical to the one at issue here did not prohibit the shipper (the United States) from asserting "by way of defense" unreasonable-rate claims against a carrier seeking to collect on previous shipments. Respondents seek to distinguish *Western Pacific* on the ground that the United States has a unique statutory setoff right (now codified at 31 U. S. C. § 3726), allowing it to deduct from amounts due to a carrier prior overcharges by the carrier. That statute may well have been essential to the holding in the case, since some of the amounts withheld by the United States were not recoupments (they related to shipments other than those that were the subjects of the carriers' suits). But the rationale of the case is the same as the rationale that permits recoupment here: "Only the clearest congressional language could force us to a result which would allow a carrier to recover unreasonable charges with impunity merely by waiting two years before filing suit." 352 U. S., at 71. See *Glama Dress Co.* v. *Mid-South Transports, Inc.*, 335 I. C. C. 586, 589 (1969). Courts of Appeals have understood *Western Pacific* as expressing not just a narrow holding based on the United States setoff statute, but a general principle of recoupment applicable in other contexts. See *Distribution Services, Ltd.* v. *Eddie Parker Interests, Inc.*, 897 F. 2d 811, 813 (CA5 1990); *In re Smith*, 737 F. 2d 1549, 1554 (CA11 1984); *118 East 60th Owners, Inc.*

v. *Bonner Properties, Inc.*, 677 F. 2d 200, 203 (CA2 1982); *Luckenbach S. S. Co.* v. *United States*, 312 F. 2d 545, 549, n. 3 (CA2 1963).

One major consequence does attach to the fact that an unreasonable-rate claim is technically a counterclaim rather than a defense: A defense cannot possibly be adjudicated separately from the plaintiff's claim to which it applies; a counterclaim can be. Federal Rule of Civil Procedure 54(b) permits a district court to enter separate final judgment on any claim or counterclaim, after making "an express determination that there is no just reason for delay." See *Sears, Roebuck & Co.* v. *Mackey*, 351 U. S. 427 (1956); *Cold Metal Process Co.* v. *United Engineering & Foundry Co.*, 351 U. S. 445 (1956). This power is largely discretionary, see *Curtiss-Wright Corp.* v. *General Electric Co.*, 446 U. S. 1, 10 (1980), to be exercised in light of "judicial administrative interests as well as the equities involved," *id.*, at 8, and giving due weight to "'the historic federal policy against piecemeal appeals,'" *ibid.* (quoting *Sears, supra,* at 438).[2]

Nothing in the ICA provides that, in an action by a carrier to collect undercharges, a §11705(b)(3) counterclaim is not subject to the normally applicable provisions of the Federal Rules. Respondents contend that the so-called "filed rate doctrine" gives them absolute entitlement to judgment on their undercharge claims, without defense or counterclaim.

---

[2] For purposes of applying the Federal Rules of Civil Procedure governing counterclaims, it does not matter that this action arose in bankruptcy. Rules 8 and 54 are made fully applicable in adversary proceedings by Bankruptcy Rules 7008 and 7054, and Rule 13 is made applicable with only minor variation (not relevant here) by Bankruptcy Rule 7013. It is well settled, moreover, that a bankruptcy defendant can meet a plaintiff-debtor's claim with a counterclaim arising out of the same transaction, at least to the extent that the defendant merely seeks recoupment. See *In re B & L Oil Co.*, 782 F. 2d 155, 157 (CA10 1986); *Lee* v. *Schweiker*, 739 F. 2d 870, 875 (CA3 1984). Recoupment permits a determination of the "just and proper liability on the main issue," and involves "no element of preference." 4 Collier on Bankruptcy ¶ 553.03, p. 553–17 (15th ed. 1991).

We disagree. The filed rate doctrine embodies the principle that a shipper cannot avoid payment of the tariff rate by invoking common-law claims and defenses such as ignorance, estoppel, or prior agreement to a different rate. See *Texas & Pacific R. Co.* v. *Mugg*, 202 U. S. 242, 245 (1906); *Louisville & Nashville R. Co.* v. *Maxwell*, 237 U. S. 94, 98 (1915); *Pittsburgh, C., C. & S. L. R. Co.* v. *Fink*, 250 U. S. 577, 581–582 (1919). It assuredly does *not* preclude avoidance of the tariff rate, however, through claims and defenses that are specifically accorded by the ICA itself. We can agree with respondents that this latter category does not include any "unreasonable rate defense," derived from the general ICA requirement (now codified in § 10701(a)) that a carrier's rates be "reasonable." See *T. I. M. E. Inc.* v. *United States*, 359 U. S. 464, 468–472 (1959). But we cannot agree that the filed rate doctrine precludes shippers from asserting (by way of claim *or* counterclaim) the reparations rights explicitly conferred by § 11705(b)(3).

Contrary to respondents' contention, the preclusive effect of the filed rate doctrine over reparations counterclaims is not established by our opinion in *Crancer* v. *Lowden*, 315 U. S. 631 (1942). There, shippers sued by a rail carrier for payment of tariff rates challenged them as unreasonable, and sought to stay the collection action until the ICC had an opportunity to rule on that issue. The District Court denied the stay and entered judgment for the carrier. But unlike the present petitioners, the shippers in *Crancer had* no counterclaim; they had already instituted an administrative reparations proceeding (as the ICA allowed for rail carriage) before they were sued in district court, see Reply Brief for Petitioners 13 and Brief for Respondents 18, in *Crancer* v. *Lowden*, O. T. 1941, No. 505, which precluded filing a reparations claim in district court. See 49 U. S. C. § 9 (1946 ed.). Moreover, all that *Crancer* held was that "there was no abuse of discretion by the trial judge," since the equities balanced against waiting for the ICC's determination. 315

U. S., at 636. Thus, *Crancer* held that the court was not *required* to stay the collection proceeding until the ICC ruled on the reasonableness of rates; not that the court was *prohibited* from doing so. That is entirely consistent with our holding here.

## III

Respondents raise two arguments to the effect that petitioners' § 11705(b)(3) counterclaims are not yet cognizable in court. First, respondents argue that there exists what they denominate as a "pay first" rule, whereby payment of the tariff rate is a "prerequisite to litigating the rate reasonableness issue." Brief for Respondents 23. See also *Milne Truck Lines, Inc.* v. *Makita U. S. A., Inc.*, 970 F. 2d 564, 572 (CA9 1992) (embracing similar theory). That argument would have merit if the holding in *United States ex rel. Louisville Cement Co.* v. *ICC*, 246 U. S. 638 (1918), were still good law. In that case, this Court held that a shipper's cause of action for reparations did not accrue "until payment had been made of the unreasonable charges." *Id.*, at 644. The opinion noted that "if Congress had intended that the cause of action of the shipper to recover damages for unreasonable charges should accrue when the shipment was received, or when it was delivered by the carrier, . . . a simple and obvious form for expressing that intention would have been used." *Ibid.* Within two years, Congress enacted a simple and obvious provision stating that any "cause of action in respect of a shipment of property shall . . . be deemed to accrue upon delivery or tender of delivery." Transportation Act of 1920, § 424, 41 Stat. 492. That provision survives in substantially the same form in text now codified at 49 U. S. C. § 11706(g). While it is theoretically possible for a statute to create a cause of action that accrues at one time for the purpose of calculating when the statute of limitations begins to run, but at another time for the purpose of bringing suit, we will not infer such an odd result in the absence of any such indication in the statute. We therefore hold that

petitioners could assert a claim under § 11705(b)(3) before payment, but after their shipments were delivered.

Second, respondents contend that the doctrine of primary jurisdiction requires petitioners initially to present their unreasonable-rate claims to the ICC, rather than to a court. That reflects a mistaken understanding of primary jurisdiction, which is a doctrine specifically applicable to claims properly cognizable in court that contain some issue within the special competence of an administrative agency. It requires the court to enable a "referral" to the agency, staying further proceedings so as to give the parties reasonable opportunity to seek an administrative ruling.[3] See *Western Pacific,* 352 U. S., at 63–64; *Ricci* v. *Chicago Mercantile Exchange,* 409 U. S. 289, 291, 302 (1973); *Port of Boston Marine Terminal Assn.* v. *Rederiaktiebolaget Transatlantic,* 400 U. S. 62, 65, 68 (1970). Referral of the issue to the administrative agency does not deprive the court of jurisdiction; it has discretion either to retain jurisdiction or, if the parties would not be unfairly disadvantaged, to dismiss the case

---

[3] "Referral" is sometimes loosely described as a process whereby a court refers an issue to an agency. See, *e. g.,* 28 U. S. C. § 1336. But the ICA (like most statutes) contains no mechanism whereby a court can on its own authority demand or request a determination from the agency; that is left to the adversary system, the court merely staying its proceedings while the shipper files an administrative complaint under § 11701(b). See § 11705(c)(1) (second sentence). Use of the term "referral" to describe this process seems to have originated in *Western Pacific,* which asserted that, where issues within the special competence of an agency arise, "the judicial process is suspended pending referral of such issues to the administrative body for its views." *United States* v. *Western Pacific R. Co.,* 352 U. S. 59, 64 (1956). At the conclusion of that passage, the *Western Pacific* Court cited *General American Tank Car Corp.* v. *El Dorado Terminal Co.,* 308 U. S. 422, 433 (1940), which in turn cited *Mitchell Coal & Coke Co.* v. *Pennsylvania R. Co.,* 230 U. S. 247 (1913). *Mitchell Coal* spelled out the actual procedure contemplated, holding that further action by the district court should "be stayed so as to give the plaintiff a reasonable opportunity within which to apply to the Commission for a ruling as to the reasonableness of the practice," *id.,* at 267.

without prejudice. See *Carnation Co.* v. *Pacific Westbound Conference*, 383 U. S. 213, 222–223 (1966); *Mitchell Coal & Coke Co.* v. *Pennsylvania R. Co.*, 230 U. S. 247, 266–267 (1913); Jaffe, Primary Jurisdiction, 77 Harv. L. Rev. 1037, 1055 (1964).

The result that respondents seek would be produced, not by the doctrine of primary jurisdiction, but by the doctrine of exhaustion of administrative remedies. Where relief is available from an administrative agency, the plaintiff is ordinarily required to pursue that avenue of redress before proceeding to the courts; and until that recourse is exhausted, suit is premature and must be dismissed. See *Myers* v. *Bethlehem Shipbuilding Corp.*, 303 U. S. 41, 50–51 (1938); *Heckler* v. *Ringer*, 466 U. S. 602, 617, 619, and n. 12 (1984). That doctrine is inapplicable to petitioners' reparations claims, however, because the ICC has long interpreted its statute as giving it no power to decree reparations relief. Shortly after enactment of the provision now codified at § 11705(b)(3), the ICC said that the law did not "grant the Commission any initial jurisdiction . . . with respect to the award of reparations"; rather, "shippers' recourse *must* be to the courts," which would "refer" the issue of rate reasonableness to the Commission. *Informal Procedure for Determining Motor Carrier and Freight Forwarder Reparation*, 335 I. C. C. 403, 413 (1969). The ICC continues to adhere to that view. Brief for United States as *Amicus Curiae* 9, n. 6; *NITL—Petition to Institute Rulemaking on Negotiated Motor Common Carrier Rates*, 3 I. C. C. 2d, at 106–107; *NITL—Petition to Institute Rulemaking on Negotiated Motor Common Carrier Rates*, 5 I. C. C. 2d, at 625, 630–631. We find that to be at least a reasonable interpretation of the statute, and hence a binding one. *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837 (1984).

Nor can we discern within the ICA an intent that, even though the ICC cannot decree relief, ICC determination of

the reasonable-rate issue must be obtained before filing the civil action. Since the limitations period for filing actions under § 11705(b)(3) begins running at the time of delivery of the shipment, rather than at the time the ICC enters an order, compare §§ 11706(c)(2) and (g) with § 11706(e), the period could expire before the ICC acted. We are not disposed to find an implicit prior-agency-determination requirement that would have such consequences.

## IV

Since we have concluded that petitioners' unreasonable-rate claims are subject to the ordinary rules governing counterclaims, the judgment below must be reversed. Neither the Court of Appeals nor the District Court made the "express determination" required under Rule 54(b) for entry of a separate judgment on respondents' claims, and we cannot say categorically that it would be an abuse of discretion either to grant or to deny separate judgment. In the ordinary case, where a carrier is solvent and has promptly initiated suit, the equities favor separate judgment on the principal claim: referral of the unreasonable-rate issue could produce substantial delay, and tariff rates not disapproved by the ICC are legal rates, binding on both the shipper and the carrier. See *Keogh* v. *Chicago & Northwestern R. Co.,* 260 U. S. 156, 163 (1922); *Arizona Grocery Co.* v. *Atchison, T. & S. F. R. Co.,* 284 U. S. 370, 384 (1932); *Lowden* v. *Simonds-Shields-Lonsdale Grain Co.,* 306 U. S. 516, 520 (1939). The equities change, however, when the suing carrier is in bankruptcy. Indeed, we have previously held that even a "threat of insolvency" of the party seeking separate judgment is a factor weighing against it. See *Curtiss-Wright,* 446 U. S., at 12. Even so, we cannot say that insolvency is an absolute bar. Conceivably, a district court could determine that other equities favor separate judgment—for example, a threat that the *shipper* may become insolvent, which Rule 62(h) would allow a court to protect against by

entering separate judgment for the carrier but staying enforcement on condition that the shipper deposit the amount of the judgment with the court. *Id.*, at 13, n. 3.

The judgment of the Court of Appeals is reversed, and the case is remanded for proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE BLACKMUN dissents.