The **SERVICEMASTER COMPANY, L.P.**

v.

**FTR TRANSPORT, INC.**

Civ. A. No. 93–CV–1270.

United States District Court, E.D. Pennsylvania.

Sept. 7, 1994.

Mary Elizabeth Bogan, LaBrum & Doak, Philadelphia, PA, for plaintiff.

Paul D. Keenan, Clark, Ladner, Fortenbaugh & Young, Philadelphia, PA, for defendant.

## MEMORANDUM

JAMES McGIRR KELLY, District Judge.

Presently before the Court are two motions of Defendant FTR Transport, Inc. ("FTR"): (1) Motion for Summary Judgment, (2) Motion for Sanctions pursuant to Federal Rule of Civil Procedure 11(b)(2) and (b)(3). This action arises from allegations by Plaintiff ServiceMaster Company, L.P. ("ServiceMaster") that it had been overcharged $226,937.30 for 210 shipments of freight. FTR filed a counterclaim to recover $16,093.22 in unpaid invoices for its brokerage services. ServiceMaster asserts that this Court has jurisdiction over the matter pursuant to 49 U.S.C. § 11705(b)(2) and 28 U.S.C. § 1337.

### BACKGROUND

ServiceMaster's principal place of business is in Illinois. It has various branch manufacturing operations, including one in Pennsylvania. FTR is an independent freight broker, licensed by the Interstate Commerce Commission ("ICC"). Its principal place of business is in Pennsylvania.

Between 1987 and 1991, Robert Barley was the traffic coordinator for ServiceMaster, responsible for the routing of freight by ServiceMaster to its various customers. He had limited authority to engage transportation services, and could not commit ServiceMaster to any contract worth more than $10,000. Dep. of Andrew Konstanty at 16. In the spring of 1989, Richard Beers, a Kingsway employee, advised Barley that ServiceMaster could obtain better service than Kingsway had been providing by using FTR Transport. Dep. of Robert Barley at 23. Beers informed Barley that FTR Transport had numerous motor carriers under contract and might be able to move freight for less than typical tariff rates charged by common carriers for exclusive use.[1] Dep. of Richard Beers at 15, 27–28.

In a letter dated April 10, 1989, Richard Farina, an FTR officer, quoted ServiceMaster "exclusive use" charges to several states.[2]

---

1. Exclusive use carriage means that the trailer of the truck is exclusively used by the shipper. Unlike a truckload movement, no cargo from other shippers can be put on an exclusive use truckload. Pl.'s Mem. in Opp. to Mot. for Summ.J. at 2–3.

2. ServiceMaster alleges that it never used exclusive use carriage for domestic and Canadian

The letter stated: "Rates pay for exclusive use of trailer, and reflect between five and sixty percent of Bureau Tariff exclusive use rates in the MAC, E. Central, Niagara Frontier and Southern Motor Tariff Bureau." *See* Def.'s Mot. for Summ.J., Exh. C. Pursuant to this quote, ServiceMaster used FTR's services from 1989 to 1991. Dep. of Robert Barley at 7–8.

FTR asserts that it arranged to have different carriers that were under contract to FTR provide service to ServiceMaster.[3] Dep. of Richard Beers at 17. FTR claims that by moving the freight by contract carriage, FTR, as an independent broker, was able to charge ServiceMaster less than a common carrier charging exclusive use tariff rates would charge.[4] Def.'s Mot. for Summ.J. at 4.

In November 1991, after deciding that the services provided by FTR had not been cost effective, ServiceMaster terminated its relationship with FTR. Dep. of Andrew Konstanty at 26. Barley was discharged for mismanagement. *Id.* at 30. An audit firm made demand for overcharges from FTR. The demand was not answered.

ServiceMaster then filed a complaint against FTR and various carriers, alleging that it had been overcharged $226,937.20 for 210 shipments of freight by motor carriage. After the close of discovery, ServiceMaster settled with all of the other original defendants, and filed an amended complaint, naming FTR as the sole defendant. ServiceMaster pleads four theories of recovery: (1) "broker liability" for overcharges on goods transported by common carrier under the filed rate doctrine; (2) two alternative theories of breach of contract; and (3) misrepresentation.

In support of its Motion for Summary Judgment, FTR makes several arguments. It argues that the Court lacks subject matter jurisdiction because the statutory provision upon which ServiceMaster relies pertains only to carriers and freight forwarders, not to brokers. FTR contends that the contract between the broker and the shipper is not regulated by federal law but is a "garden variety" contract. FTR argues, as a matter of law, that it cannot be held liable for overcharges based upon tariff rates because brokers cannot be held liable for overcharges. Lastly, FTR asserts that the breach of contract claims and the misrepresentation claim have no factual basis.

## DISCUSSION

### A. Motion for Summary Judgment

Under Fed.R.Civ.P. 56(c), summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." This court is required, in resolving a motion for summary judgment pursuant to Rule 56, to determine whether "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In making this determination, the evidence of the nonmoving party is to be believed, and the district court must draw all reasonable inferences in the nonmovant's favor. *See id.* at 255, 106 S.Ct. at 2513–14. Furthermore, while the movant bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the record which

---

traffic out of its Lancaster, Pennsylvania facility. Aff. of Andrew Konstanty, ¶ 2. It alleges that it never had the need for exclusive use carriage and that it never instructed its traffic managers to use exclusive use carriage because of its exorbitant and unnecessary cost. Aff. of A. Konstanty, ¶ 3. Whether or not exclusive use carriage was used is irrelevant to my disposition of this motion.

**3.** In contrast to common carriers, contract carriers are not required to file tariffs and are exempt from the filed rate doctrine. *Exemption of Motor Contract Carriers from Tariff Filing Requirements,*

133 M.C.C. 150 (1983), *aff'd sub nom. Central and S. Motor Freight Tariff Ass'n v. United States,* 757 F.2d 301 (D.C.Cir.), *cert. denied,* 474 U.S. 1019, 106 S.Ct. 568, 88 L.Ed.2d 553 (1985). Thus, contract carriers may negotiate rates for their services.

**4.** Whether FTR used contract carriers or common carriers is also in dispute. For purposes of this Motion, the Court will assume that FTR arranged to have the goods moved by common carrier, as alleged by ServiceMaster.

demonstrate the absence of a genuine issue of material fact, Rule 56(c) requires the entry of summary judgment "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

### 1. Broker Liability

The statutory provision upon which ServiceMaster asserts jurisdiction provides:

**§ 11705. Rights and remedies of persons injured by certain carriers**

(b)(1) A common carrier providing transportation or service subject to the jurisdiction of the Commission under chapter 105 of this title ... is liable to a person for amounts charged that exceed the applicable rate for transportation or service contained in a tariff filed under subchapter IV of chapter 107 of this title....

(2) A common carrier providing transportation subject to the jurisdiction of the Commission ... is liable for damages sustained by a person as a result of an act or omission of that carrier in violation of this subtitle.

49 U.S.C. § 11705(b)(1)(2) (Supp.1994).

The Interstate Commerce Act ("ICA") requires motor common carriers to publish their rates in tariffs filed with the ICC. 49 U.S.C. § 10762; *Maislin Indus. v. Primary Steel,* 497 U.S. 116, 119, 110 S.Ct. 2759, 2762, 111 L.Ed.2d 94 (1990).[5] Both carriers and shippers are prohibited from deviating from those rates. 49 U.S.C. § 10761; *Maislin,* 497 U.S. at 119, 110 S.Ct. at 2762. The rates are unenforceable only if the ICC finds the rate to be unreasonable. *Maislin,* 497 U.S.

---

**5.** In *Maislin,* the Supreme Court unambiguously affirmed the filed rate doctrine, which had been undermined by the ICC's *Negotiated Rates* policy. The *Negotiated Rates* policy had allowed carriers to negotiate rates lower than the filed rate. *See Maislin,* 497 U.S. at 130, 110 S.Ct. at 2767–68.

**6.** There is a pattern to the cases involving disputes over filed rates, particularly in the era of deregulation following enactment of the Motor Carrier Act of 1980. *Reiter v. Cooper,* —— U.S.

at 128, 110 S.Ct. at 2766–67. The ICA prohibits a carrier from providing services at any rate other than the filed rate (also known as the tariff):

Except as provided in this subtitle, a carrier providing transportation or service subject to the jurisdiction of the Interstate Commerce Commission ... shall provide that transportation or service only if the rate for the transportation or service is contained in a tariff that is in effect under this subchapter. That carrier may not charge or receive a different compensation for that transportation or service than the rate specified in the tariff whether by returning a part of that rate to a person, giving a person a privilege....

49 U.S.C. § 10761(a). Deviation from the filed rate may result in the imposition of civil or criminal sanctions on the carrier or shipper. 49 U.S.C. §§ 11902–04; *Maislin,* 497 U.S. at 120, 110 S.Ct. at 2762–63.

 The ICC regulates interstate transportation by motor common carriers in order to ensure that rates are reasonable and nondiscriminatory. *Maislin,* 497 U.S. at 119, 110 S.Ct. at 2762. The filed rate governs the legal relationship between a common carrier and a shipper.[6] *Id.* at 126, 110 S.Ct. at 2765–66. The carrier's duty to file rates with the Commission, and the obligation to charge shippers only those rates, have been considered essential to preventing price discrimination and stabilizing rates. *Id.*

 ServiceMaster argues that the filed rate doctrine also governs the relationship between brokers and shippers and that, therefore, brokers are liable for the filed rate. In support of this argument, it cites the following regulation:

——, ——, 113 S.Ct. 1213, 1216, 122 L.Ed.2d 604 (1993). Typically, a motor carrier negotiates with a shipper for a rate lower than the tariff rate which the ICC requires the carrier to publish and file. After the shipments are delivered and paid for, sometimes years later, the carrier goes bankrupt. Finally, the trustee in bankruptcy sues the shipper to recover the difference between the negotiated rate and the filed rate, or the "undercharge". *Id.*

## § 1045.10 Duties and obligation of brokers.

Where the broker acts on behalf of a person bound by law or a Commission regulation as to the transmittal of bills or payments, the broker must also abide by the law or regulations which apply to that person.

49 C.F.R. § 1045.10 (1993). ServiceMaster asserts that this regulation binds brokers to the same pricing regulations that bind carriers. It argues that the filed rate doctrine would be emasculated if carriers could circumvent it by using brokers as intermediaries, and it would be anomalous for a court to hold that a carrier can only charge the filed rate, but that a broker can charge any rate.

While acknowledging that contracts between a broker and carrier may be subject to federal regulation, FTR asserts that the contract between a broker and shipper is a "garden variety contract" which is not regulated by federal law. FTR further argues that under this regulation, independent brokers who act on behalf of shippers are liable, like shippers, to carriers for the carriers' filed tariff rates. *See Reiter v. Cooper,* 507 U.S. ——, ——, 113 S.Ct. 1213, 1216, 122 L.Ed.2d 604 (1993); *Interstate Commerce Commission v. Wagonmaster, Inc.,* 1994 WL 53757 (N.D.Ill. Feb. 18, 1994); *Sovran Bank/Southeast v. ICB Transp. Services,* 1990 WL 311594 at *2 (E.D.Tenn. July 13, 1990). However, FTR argues, brokers are not liable to shippers for the carrier's filed rate.

It is uncontested that FTR is a transportation broker, licensed by the ICC. A broker is a person:

other than a motor carrier or employee or agent of a motor carrier, that as a principal or agent sells, offers for sale, negotiates for, or holds itself out by solicitation, advertisement, or otherwise as selling, providing or arranging for, transportation by motor carrier for compensation.

49 U.S.C. § 10102(1); *Paul Arpin Van Lines v. Universal Transp. Services,* 988 F.2d 288, 292 (1st Cir.1993). A shipper may choose to hire a broker to arrange for its transportation service needs. That broker must be licensed and bonded. 49 U.S.C. §§ 10924(c)(1), 10927(b); *Sovran Bank/Southeast,* 1990 WL 311594 at *2. Generally, a broker is independent, serving as a middleman between motor carriers and the shipping public. *Reiter v. Cooper,* 507 U.S. at ——, 113 S.Ct. at 1216. By its very definition, a broker arranges transportation with a motor carrier *for compensation.* 49 U.S.C. § 10102(1) (emphasis added). Generally, this compensation is the difference between what the broker pays the carrier and what the broker charges the shipper.

Contracts between the broker and carrier may be subject to federal regulation.[7] If a move goes by common carriage, the broker is liable to the carrier for the appropriate filed rate. 49 U.S.C. § 10761(a); 49 C.F.R. § 1045.10. If the move goes by contract carriage, the broker pays the contract rate. Under either scenario, when a broker arranges transportation, the broker is liable to the carrier for paying the appropriate rate on behalf of the shipper.

 Regardless of whether a broker is liable to the carrier for its filed rate, contracts between the broker and the shipper are not subject to federal regulation. A broker is not liable to the shipper for the carrier's filed rate. If a broker were required to charge the shipper for whom it arranged transportation the same rate as it was required to pay the carrier to move the goods, there would be no profit or incentive for the broker. Such a result is illogical and impractical.

Brokers may be deemed shippers for the purpose of paying carriers. *Wagonmaster,* 1994 WL 53757 at *1 (under 49 C.F.R.

---

7. Courts disagree as to a broker's liability to the carrier for freight undercharges. *See, e.g., Atlantis Express v. Standard Transp. Services,* 955 F.2d 529, 531 (8th Cir.1992) (because issues relating to broker liability and payment of commissions are complex and their resolution requires interpretation of ambiguous regulation and expert knowledge on function of broker-carrier arrangements, court ordered ICC to resolve issue under doctrine of primary jurisdiction); *Transcontinental Freight Systems v. M.A.C. Management,* 1993 WL 515485 at *1 (N.D.Ill. Dec. 7, 1993) (court found regulation ambiguous and found issue of broker's liability for undercharges warranted application of primary jurisdiction doctrine); *cf., Sovran Bank/Southeast,* 1990 WL 311594 at *2 (broker liable for filed rate based on regulation).

§ 1045.10, broker who collects freight charges from shipper and fails to remit those charges to carrier is liable to carrier); *Sovran Bank/Southeast,* 1990 WL 311594 at *2 (broker assumes liability for filed rate when it bills and collects freight charges). FTR, on behalf of ServiceMaster, was required to pay its carriers the filed rate for any move it arranged for ServiceMaster that went by common carriage. However, FTR was not required to charge ServiceMaster the same filed rate that it paid its carriers. No court has held an independent broker to be a carrier for purposes of assessing overcharges.

■ Alternatively, ServiceMaster argues that FTR acted as the agent of various carriers and, in that capacity, was required to abide by the laws and regulations governing carriers. Third Am.Compl., ¶¶ 24–26. FTR responds that under the statutory definition of "agent" it cannot be considered an agent.

The distinction between agent and broker is made explicit in 49 C.F.R. § 1045.2:

(a) "Broker" means a person who, for compensation, arranges, or offers to arrange, the transportation of property by an authorized motor carrier. Motor carriers, or persons who are employees or bona fide agents of carriers, are not brokers within the meaning of this section when they arrange the transportation of shipments which they are authorized to transport and which they have accepted and legally bound themselves to transport.

(b) "Bona fide agents" are persons who are part of the normal organization of a motor carrier and perform duties under the carrier's directions pursuant to a preexisting agreement which provides for a continuing relationship, precluding the exercise of discretion on the part of the agent in allocating traffic between the carrier and others.

49 C.F.R. § 1045.2(a) and (b); *Paul Arpin Van Lines,* 988 F.2d 288, 292 (1st Cir.1993). ServiceMaster asserts that the "concept of agency is not limited to the statutory creature known as carrier's agent," and that a broker acts as the carrier's agent or principal in each transaction involving the selling or arranging of transportation. Pl.'s Mem. in Opp. to Mot. for Summ.J. at 10. Service-Master notes that FTR was listed as the carrier on almost all of the bills of lading. Furthermore, ServiceMaster notes that FTR's contract states:

The relationship of carrier to FTR shall, at all times, be that of an independent contractor, except that FTR shall be the agent for Carrier for the collection and payment of charges to Carrier. Carrier agrees it will look only to FTR for payment if the billed party has paid FTR.

FTR Form Contract, Pl's Mem. in Opp. to Mot. for Summ.J., Exh 4. From these facts, ServiceMaster contends that there are substantial issues of fact regarding whether FTR acted on the carrier's behalf or Service-Master's behalf.

FTR acted as a broker. FTR selected, and had complete discretion to select, each carrier for each separate freight movement. Dep. of Robert Barley at 9–12. FTR paid each carrier in accordance with its agreements with those carriers. ServiceMaster prepared the bills of lading and designated FTR as the carrier because it had no way of knowing who the carrier for a particular shipment would be. *Id.* at 12. ServiceMaster's traffic manager testified that FTR never identified itself as an agent for any carrier nor acted as a carrier. *Id.* at 10. The fact that FTR was to act as the carrier's agent for payment purposes is a recognition of FTR's role as a middleman, whereby FTR collected money from ServiceMaster and paid it to the carrier. These facts indicate that FTR was a broker, not an agent.

■ The definition of "agent" unequivocally provides that a bona fide carrier's agent can only serve one carrier. FTR's does not fit within the statutory definition of carrier's agent. Moreover, contrary to ServiceMaster's argument, the concept of agency under the ICA is limited to the statutory definition. *See Paul Arpin Van Lines,* 988 F.2d at 291–92.

As a matter of law, ServiceMaster does not have a claim against FTR based on broker liability under the ICA. FTR acted as a licensed independent broker, not as an agent. FTR's liability as a broker was to pay carriers the appropriate rate. FTR's liability to

its carriers is irrelevant to ServiceMaster. The rates ServiceMaster agreed to pay FTR for acting as a transportation broker were negotiated between the parties. These rates are not regulated. Accordingly, summary judgment must be granted to FTR on ServiceMaster's claim for broker liability.

### 2. State Law Claims

ServiceMaster alleges alternative breach of contract claims in Counts II and III, and misrepresentation in Count IV. ServiceMaster pled that the Court has jurisdiction pursuant to 49 U.S.C. § 11705(b)(2) and 28 U.S.C. § 1337. I have determined that the dispute between the parties does not arise under federal law and have dismissed the only claim over which I had original jurisdiction. When a district court has dismissed all claims over which it has original jurisdiction, the court may decline to exercise supplemental jurisdiction over pendent state law claims. 28 U.S.C. § 1367(c)(3). Accordingly, Counts II, III and IV are dismissed without prejudice as to their refiling in state court.

### B. Motion for Sanctions

Also before the Court is FTR's Motion for Sanctions. Rule 11 provides that, in presenting to the court a pleading or other filing, the attorney certifies that the claims are not presented for any improper purpose, that the claims are warranted by existing law or by a nonfrivolous argument for the extension of existing law, and that the factual allegations have evidentiary support, or if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for discovery. Fed.R.Civ.P. 11(b)(1), (2) and (3).

"An attorney's signature certifies that the attorney has satisfied three duties: (1) that he has read the documents; (2) that he has made a reasonable inquiry; and (3) that he is not acting in bad faith." *CTC Imports & Exports v. Nigerian Petroleum Corp.*, 951 F.2d 573, 578 (3d Cir.1991), *cert. denied sub nom, Aham–Neze v. Sohio Supply Co.*, —— U.S. ——, 112 S.Ct. 1950, 118 L.Ed.2d 554 (1992). Sanctions are appropriate "only if the filing of a complaint constitutes abusive litigation or misuse of the Court's process." *CTC Imports*, 951 F.2d at 579 (quoting *Teamsters Local Union No. 430 v. Cement Express, Inc.*, 841 F.2d 66, 68 (3d Cir.), *cert. denied*, 488 U.S. 848, 109 S.Ct. 128, 102 L.Ed.2d 101 (1988)).

The standard for testing an attorney's conduct is reasonableness under the circumstances. *Gaiardo v. Ethyl Corp.*, 835 F.2d 479, 482 (3d Cir.1987). In determining the reasonableness of the attorney's pre-filing inquiry, a court is to consider the amount of time available to the signer for reasonable investigation, the necessity of reliance on the conduct for underlying factual information, whether the case was referred to the signer by another member of the bar, and the plausibility of the legal position advocated. *Mary Ann Pensiero, Inc. v. Lingle*, 847 F.2d 90, 95 (3d Cir.1988).

FTR contends that it is entitled to reasonable attorney's fees in connection with the defense of ServiceMaster's claims in that the filing of ServiceMaster's amended complaint was unreasonable under the circumstances and was a clear violation of Federal Rule of Civil Procedure 11. Specifically, FTR contends that ServiceMaster should have realized at the end of discovery that it had no factual basis to support the allegations of the complaint, and that its pleadings lacked legal justification.

After consideration of ServiceMaster's view of the facts, it appears to the Court that ServiceMaster had a factual basis to support its allegations. Furthermore, ServiceMaster obtained two expert opinions, both of which supported its view of the facts. Therefore, I find that ServiceMaster's pre-filing inquiry was reasonable under the circumstances.

ServiceMaster has acknowledged that its position as to broker liability is unique and a case of first impression. In spite of the absence of case law governing broker liability for overcharges, I find that ServiceMaster's arguments are not frivolous contentions, but rather are good faith arguments for the extension of existing law. I do not find that ServiceMaster has acted so unreasonably as to justify the imposition of Rule 11 sanctions. Accordingly, FTR's motion will be denied.