45 F.3d 503
 Fed. Carr. Cas. P 83,962, 310 U.S.App.D.C. 202
 ONEIDA MOTOR FREIGHT, INC., Petitioner,
v.
INTERSTATE COMMERCE COMMISSION; United States of America, Respondents,
National Motor Freight Traffic Association; Georgia-Pacific
Corporation; International Brotherhood of Teamsters;
National Industrial Transportation League; Chattanooga Gas
Company; National Small Shipments Traffic Conference, Inc.;
Health and Personal Care Distribution Conference, Inc., Intervenors.
 No. 93-1026.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Jan. 18, 1995.
Decided Feb. 7, 1995.
 
 Petition for Review of an Order of the Interstate Commerce Commission.
 Joseph L. Steinfeld, Jr., Washington, DC, argued the cause for petitioner. With him on the briefs were Robert B. Walker and John T. Siegler, Washington, DC.
 Henri F. Rush, General Counsel, Interstate Commerce Commission, Washington, DC, argued the cause for respondents. With him on the brief were Ellen D. Hanson, Deputy General Counsel and Judith A. Albert, Atty., Interstate Commerce Commission, Anne K. Bingaman, Asst. Atty. Gen., Robert B. Nicholson and John P. Fonte, Attorneys, U.S. Dept. of Justice, Washington, DC.
 Betty Jo Christian, Washington, DC, argued the cause for intervenors Georgia-Pacific Corp., et al. With her on the joint brief was David H. Coburn, Washington, DC.
 Marc J. Fink, Torbjorn B. Sjogren and John R. Bagileo, Washington, DC, were on the joint brief for intervenors International Brotherhood of Teamsters and National Motor Freight Traffic Ass'n. Kevin M. Williams, Washington, DC, entered an appearance for intervenor National Motor Freight Traffic Ass'n.
 Richard D. Fortin and Nicholas J. DiMichael, Washington, DC, entered appearances for intervenor National Industrial Transp. League. Kevin M. Downey, Jacolyn A. Simmons and John E. Holtzinger, Jr., Washington, DC, entered appearances for intervenor Chattanooga Gas Company. John M. Cutler, Jr., and Daniel J. Sweeney, Washington, DC, entered appearances for intervenors National Small Shipments Traffic Conference, Inc. and Health and Personal Care Distribution Conference, Inc.
 Before EDWARDS, Chief Judge, WALD and HENDERSON, Circuit Judges.
 Opinion for the Court filed PER CURIAM.
 
 PER CURIAM:
 
 1
 Petitioner Oneida Motor Freight, Inc. ("Oneida") seeks review of three orders of the Interstate Commerce Commission ("ICC" or "Commission"). Oneida contends that the standard employed by the ICC to find petitioner's filed rate unreasonably high was inconsistent with the dictates of the Interstate Commerce Act ("ICA" or "Act"). Oneida further argues that even if the ICC properly invalidated the filed rate, the Commission's failure to then determine the "maximum reasonable rate" that Oneida could have charged was an abuse of discretion. We agree with the Commission that petitioner's objections lack merit, and therefore deny the petition for review.
 
 I. BACKGROUND
 A. Regulatory and Factual Background
 
 2
 At the time this case arose, the ICA required motor carriers to file their rates with the ICC and to charge only the rates on file--the "filed rate doctrine." 49 U.S.C. Secs. 10761(a), 10762(a)(1) (1988).[1] Prior to 1980, most trucking companies relied on rates filed with the ICC by "rate bureaus," which for a small fee permitted carriers to utilize their tariffs. The Motor Carrier Act of 1980 ("MCA")[2] substantially reduced restrictions on motor carrier pricing, and carriers began negotiating rates to meet the demands of particular shippers. Carriers often neglected to file these rates, however, and the bureau-filed tariffs thus remained their "legal" rates.
 
 
 3
 The competitive atmosphere engendered by the MCA resulted in numerous motor carrier failures. Trustees in bankruptcy for the estates of defunct carriers interpreted the filed rate doctrine to entitle them to collect the difference between the negotiated rate that they had charged, and the "legal" filed rate. By 1992, over two hundred suits by bankrupt carriers seeking such "undercharges" were underway.
 
 
 4
 Oneida is an "undercharge" case. From November 1983 to June 1985, Oneida carried paper for intervening respondent Georgia-Pacific Corporation ("GP") at a negotiated rate paid by GP in full. After Oneida declared bankruptcy, its trustee discovered that Oneida had never filed the negotiated rate, and requested additional payments from GP based on the rate-bureau tariffs on file. These rates were approximately double the negotiated rate. GP refused to pay, and Oneida sued GP in the District Court for the District of Connecticut.
 
 B. Procedural Background
 
 5
 The district court denied GP's motion to refer the matter to the ICC, and ultimately found that GP was liable for payment of the filed rate. Before entry of final judgment, however, GP sought a declaratory order from the ICC that Oneida had engaged in "unreasonable practices" and that the rates the trustee sought to collect were "unreasonable."[3] The Second Circuit affirmed the district court's finding of shipper liability, but directed that GP's payment in satisfaction of the judgment be retained by the district court "until the ICC has decided how much, if any, should be repaid to [GP by Oneida] by way of reparation." Delta Traffic Service, Inc. v. Georgia-Pacific Corp., 936 F.2d 64, 66 (2d Cir.1991).
 
 
 6
 In three careful opinions, the ICC considered GP's "unreasonable rates" claim and the appropriate remedy.[4] The first enunciated a market-based approach for determining the "reasonableness" of filed rates for past shipments carried by now-defunct companies. The Commission explained that it would determine reasonableness by comparing the challenged rate with the market rates that had been available to move the traffic at issue. If the challenged rate was significantly above the "cluster" of market alternatives, it would be presumed unreasonable, although a carrier could rebut the presumption by showing that the traffic at issue had special characteristics such that the market rates would not have moved it. See GP I, 9 I.C.C.2d at 156-61.
 
 
 7
 Applying this standard, the Commission found that the filed rates Oneida sought to collect were far above the highest relevant comparison rates. It therefore held Oneida's tariff rate unreasonable. See id. at 170-74. Because the Commission was applying an evolving standard, however, it invited public comment on its approach and afforded Oneida an additional opportunity to demonstrate the reasonableness of its rate.[5] See id. at 179.
 
 
 8
 The ICC's second opinion adhered to the market-based approach of its first decision. The Commission explained that this method was a logical extension of its traditional "rate comparison" method,[6] and that current competitive market conditions make such comparisons an even more reliable indicium of reasonableness than in the past. See GP II, 9 I.C.C.2d at 806-09. The Commission also rejected Oneida's contention that it was required to fix a "maximum reasonable rate" once it had determined that the challenged tariff was unreasonably high. The ICC wrote that when a defunct carrier with no reasonable rate on file has collected a market rate determined to be reasonable by the Commission, nothing in the ICA entitles the carrier to additional compensation. See id. at 818-24.
 
 
 9
 The ICC's final decision addressed supplemental evidence submitted by the parties. In particular, the Commission ruled that certain rates that Oneida claimed should have been included in the ICC's "cluster" of market alternatives were properly excluded, on the ground that they were not designed to attract the kind of traffic at issue. The Commission once again held that Oneida's filed rates were unreasonably high; it therefore ordered that the funds impounded in the district court be returned to GP. See GP III, 9 I.C.C.2d at 1066-70.
 
 II. ANALYSIS
 A. The Market-Based Reasonableness Standard
 
 10
 The parties agree that the ICA authorizes the Commission to determine the reasonableness of a filed rate. See 49 U.S.C. Secs. 10761, 10762 (1988). Oneida contends, however, that the Act dictates the application of a cost-based reasonableness standard.
 
 
 11
 At the time of the Commission's decisions, Sec. 10701(e) provided in pertinent part:
 
 
 12
 [I]n proceedings to determine the reasonableness of rate levels for a motor carrier ... the Commission shall authorize revenue levels that are adequate ... to cover total operating expenses ... plus a reasonable profit. The [procedures adopted by the] Commission ... shall allow the carriers to achieve revenue levels that will provide a flow of net income ... and take into account reasonable estimated or foreseeable future costs.
 
 
 13
 49 U.S.C. Sec. 10701(e) (1988). The Commission does not dispute that Sec. 10701(e), where applicable, compels consideration of carrier costs. Its position is that Sec. 10701(e) does not apply in undercharge cases, and is instead oriented toward prescribing rates to be applied in the future by carriers still in operation. GP I, 9 I.C.C.2d at 154.
 
 
 14
 The Commission's initial decision below noted that the language of Sec. 10701(e) itself appears inconsistent with application to undercharge claims by defunct carriers. The Commission could not possibly "take into account reasonable estimated or foreseeable future costs" of such carriers, or allow them to "achieve revenue levels that will provide a flow of net income." See id. at 153-54. Moreover, as the ICC explained in an earlier case:
 
 
 15
 [T]he legislative history of Sec. 10701(e) indicates that Congress' intention was simply to address rate prescriptions for the future.... Both the Senate and House reports refer to this provision as replacing the prior Sec. 10704(b)(2)(B) revenue need factors previously considered for rate prescriptions.
 
 
 16
 Rate Reasonableness and Unreasonable Practices, 8 I.C.C.2d 61, 73 (1991). Indeed, the reports cited explain that the revision was intended to allow the ICC to take into account "future anticipated escalating costs," and so provide "prospective relief." See S.REP. No. 641, 96th Cong. 2d Sess. 12 (1980); H.R.REP. NO. 1069, 96th Cong., 2d Sess. 26 (1980). Clearly these concerns have no place in undercharge cases involving defunct carriers.
 
 
 17
 The Commission also points out that since its Georgia-Pacific decisions, Congress has explicitly approved its interpretation of Sec. 10701(e) in the context of defunct carrier undercharge cases. As part of the Negotiated Rates Act of 1993 ("NRA"), Congress amended Sec. 10701(e) to require that cost considerations be taken into account in assessing the reasonableness of past rates of those carriers still in operation:
 
 
 18
 Any complaint brought against a motor carrier [other than a carrier that is no longer transporting property] by a person ... for unreasonably high rates for past or future transportation shall be determined under this subsection.
 
 
 19
 Pub.L. No. 103-180, Sec. 2(g) 107 Stat. 2044, 2049.
 
 The accompanying House Report observed:
 
 20
 Th[is] amendment resolves th[e] dispute [about the reach of Sec. 10701(e) ] by preserving the ICC's decision on rate reasonableness in undercharge claim proceedings and provides no basis for reversing the ICC's decision in [Georgia-Pacific].
 
 
 21
 H.R.REP. No. 103-359, 103d Cong., 1st Sess. 11 (1993), U.S. Code Cong. & Admin.News 1993, p. 2044 (emphasis added).
 
 
 22
 Thus, strong evidence exists that the ICC's interpretation of Sec. 10701(e) is correct. Under Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), however, the ICC's interpretations of the ICA need only be "reasonable" to be upheld. See, e.g., Reiter v. Cooper, --- U.S. ----, ----, 113 S.Ct. 1213, 1221, 122 L.Ed.2d 604 (1993) (applying Chevron to the ICC's determination that the ICA does not grant it "initial jurisdiction ... with respect to the award of reparations"). The ICC's interpretation of Sec. 10701(e) as not extending to rate reasonableness determinations involving the past rates of defunct carriers appears eminently reasonable, and we therefore defer to it.
 
 B. The "Maximum Reasonable Rate" Debate
 
 23
 Oneida further contends that even if the ICC properly invalidated its filed rate, the Commission abused its discretion when it then failed to determine the "maximum reasonable rate" that Oneida could have charged GP. Essentially, petitioner claims that GP's action against Oneida before the ICC was for "damages," and that the only proper measure of damages under the relevant Supreme Court precedent and the ICA was the difference between the unreasonable filed rate and the "maximum reasonable rate," see 49 U.S.C. Sec. 10704(b)(1) (1988), that could have been charged. The panel agrees with the Commission that neither source of law supports Oneida's position.
 
 1. Supreme Court Precedent
 
 24
 Petitioner argues strenuously that the Supreme Court's decision in Reiter v. Cooper, --- U.S. ----, 113 S.Ct. 1213, 122 L.Ed.2d 604 (1993), compels a decision in its favor. We do not find Reiter on point. Reiter held that when a shipper sued for undercharges counterclaims that the filed rate was unreasonable, the counterclaim may--at the discretion of the district court--be adjudicated together with the principal claim. The dictum upon which petitioner relies states only that "[t]he [ICA] requires a carrier's rates to be 'reasonable,' and gives shippers an express cause of action against carriers for damages ... in the amount of the difference between the tariff rate and the rate determined to be reasonable by the ICC." Id. at ----, 113 S.Ct. at 1217 (emphasis added and citations omitted). In this case, the ICC explicitly "determined [the market rate charged and collected by Oneida] to be reasonable." See GP II, 9 I.C.C.2d at 824. Reiter thus does not prevent the ICC from using Oneida's market rate as the basis for determining GP's damages.
 
 
 25
 Nor is Security Services, Inc. v. K Mart Corp., --- U.S. ----, 114 S.Ct. 1702, 128 L.Ed.2d 433 (1994), which petitioner also urges upon us, particularly supportive of its position. Security Services held that when a carrier's undercharge suit is based on a bureau rate in which the carrier no longer officially "participates," the rate is "void" and cannot support an action. Security Services, like Reiter, makes no mention of a "maximum reasonable rate." It does, in passing, note that a "shipper's remedy [for having been charged an unreasonable rate may] ... be measured by its actual damages from having been charged the higher rate as compared to a reasonable one." Id. at ----, 114 S.Ct. at 1709-10 (emphasis added). Once again, however, the ICC did compare the higher, unreasonable rate to "a reasonable one"--it compared the tariff rate to the market rate that it had explicitly held to be reasonable. Security Services too fails to carry the day for petitioner's argument.
 
 2. Section 10704(b)(1) of the ICA
 
 26
 Finally, Oneida claims that Sec. 10704(b)(1) of the ICA itself compels the ICC to set a maximum reasonable rate. That section provides that when the Commission holds a rate in violation of the ICA, it "shall prescribe the rate (including a maximum or minimum rate) ... to be followed." 49 U.S.C. Sec. 10704(b)(1) (1988) (emphasis added). As the Commission explained, however, the language of the statute--including "prescribe" and "to be followed"--speaks in terms of rates that carriers will charge in the future, and not of defunct carriers' attempts to collect past undercharges. See GP I, 9 I.C.C.2d at 154-56. Indeed, the fact that Sec. 10704(b)(1) is directed to rate prescription for operating carriers becomes particularly patent when it is read together with the related sections that follow, Secs. 10704(b)(2)(A) and (B). They provide that "[w]hen prescribing a rate for transportation or service by common carrier[ ] ... the Commission shall consider ... the effect of the prescribed rate ... on the movement of traffic by that carrier," and "the need for revenues that are sufficient to let the carrier provide that transportation or service." These factors, like those enunciated in Sec. 10701(e), are utterly inapposite in the defunct carrier context.
 
 
 27
 Construing Sec. 10704(b)(1) to apply to undercharge cases would not only strain the statutory language, however; it would also foster an odd result. Oneida does not dispute that if it had filed the "reasonable" rate that it negotiated with GP, it would not be entitled to additional compensation under the ICA. Petitioner thus maintains that because it failed to comply with the Act's filing mandate, see 49 U.S.C. Secs. 10761(a), 10762(a)(1) (1988), Sec. 10704(b)(1) entitles it to collect an unfiled "maximum reasonable rate." We agree with the Commission that "[i]t would be anomalous indeed" to read the statute thus to confer a "right for carriers to collect unfiled rates other than those they originally agreed to, billed, [ ] accepted as payment in full," and which the Commission has determined to be reasonable in their own right. GP II, 9 I.C.C.2d at 824.
 
 
 28
 Finally, we note that the ICC has adopted parallel positions on Secs. 10701(e) and 10704(b)(1). In both instances, the Commission declines to apply statutory language oriented toward prescribing future rates for operating carriers to defunct carrier "undercharge" cases. Given this similarity, we think that Congress' explicit approval of the ICC's interpretation of Sec. 10701(e) in the defunct carrier context--discussed supra at pp. 7-8--provides support for the Commission's Sec. 10704(b)(1) position as well. In passing the NRA, Congress clearly had an opportunity to critique the distinction drawn by the Commission; instead, Congress approved it.
 
 
 29
 Although the language of Sec. 10704(b)(1) may be open to differing interpretations, the Commission's position is a reasonable one, and there is evidence that Congress has endorsed it. Accordingly, we defer to ICC's interpretation.
 
 III. CONCLUSION
 
 30
 We find the ICC's decisions below consistent with the ICA and the governing case law. The petition for review is denied.
 
 
 31
 So ordered.
 
 
 
 [1]
 Congress has since repealed this requirement, except for carrier rates that are the result of collective action. Trucking Industry Regulatory Reform Act of 1994, Pub.L. No. 103-311, Sec. 206, 108 Stat. 1683, 1684-86 (1994)
 
 
 [2]
 Pub.L. No. 96-296, 94 Stat. 793 (1980)
 
 
 [3]
 At the time GP instituted proceedings before the ICC, the ICC recognized an "unreasonable practices" defense to claims for undercharges, which was soon after eliminated by the Supreme Court in Maislin Industries, U.S. Inc. v. Primary Steel, 497 U.S. 116, 110 S.Ct. 2759, 111 L.Ed.2d 94 (1990). This left GP only an "unreasonable rates" claim, which became the basis of the Commission's opinions and this petition for review
 
 
 [4]
 The cases are all captioned "Georgia-Pacific Corp.--Petition for Declaratory Order--Certain Rates and Practices of Oneida Motor Carrier, Inc." They appear at 9 I.C.C.2d 103 (1992) ("GP I "); 9 I.C.C.2d 796 (1993) ("GP II "); and 9 I.C.C.2d 1052 (1993) ("GP III ")
 
 
 [5]
 We stayed Oneida's petition for review of this first ICC opinion, pending the Commission's consideration of public comments, and any impact Reiter v. Cooper, --- U.S. ----, 113 S.Ct. 1213, 122 L.Ed.2d 604 (1993), might have had on its decision
 
 
 [6]
 "Rate comparison" involves measuring the challenged rate against "other rates in effect on like traffic moving in the same general territory." Panhandle Lumber Co. v. Fort Worth & Denver City Railway Company, 210 I.C.C. 353, 355 (1935). Rate comparison has been a component of the Commission's "reasonableness" analyses from its earliest days. See GP II, 9 I.C.C.2d at 807 (and cases cited). The rate comparison performed by the Commission in this case differs from the traditional approach only in that the rates used as the basis for comparison are market rates filed by Oneida's competitors, rather than bureau-filed class rates. See GP I, 9 I.C.C.2d at 120-21