**Thomas A. TAYLOR; and A. Nadine Taylor, Plaintiffs,**

v.

**MAYFLOWER TRANSIT, INC.; United Van Lines, Inc.; Louderback Transportation Company, Inc.; American Way Moving Systems, Inc.; and Transprotection Service Company, Defendants.**

No. 3:98CV349–MU.

United States District Court,
W.D. North Carolina,
Charlotte Division.

Dec. 14, 2000.

Daniel C. Marks, Moreau, Marks & Gavigan, PLLC, Charlotte, NC.

Jay P. Tobin, Young, Moore & Henderson, P.A., Raleigh, NC.

## ORDER

MULLEN, Chief Judge.

THIS MATTER is before the court upon the memorandum and recommendation of United States Magistrate Max O. Cogburn, Jr., filed November 13, 2000. The parties were advised that pursuant to 28 U.S.C. § 636(b)(1)(C), written objections to the memorandum and recommendation must be filed within 10 days after service of the memorandum. It appears to the court that the parties have not filed any such objections.

After an independent and thorough review of the magistrate's memorandum, the court concludes that the recommendation to grant the summary judgment motion of Defendants United Van Lines, Inc., American Way Moving Systems, Inc., and Transprotection Service Company, to deny Mayflower Transit Inc.'s Motion for Partial Summary Judgment on plaintiff's claim for nondelivery of household goods, and to grant Mayflower Transit, Inc.'s Motion for Partial Summary Judgement as to the equitable exception of waiver is correct and in accordance with law. Accordingly, the findings and conclusions of the magistrate are affirmed.

IT IS THEREFORE ORDERED that the memorandum and recommendation of the magistrate is hereby AFFIRMED.

IT IS FURTHER ORDERED that this matter be scheduled for trial during the March, 2001 Civil Term.

## MEMORANDUM AND RECOMMENDATION

COGBURN, United States Magistrate Judge.

THIS MATTER is before the court upon defendants' Motion for Summary Judgment and Partial Summary Judgment. Having carefully considered those motions and reviewed the pleadings, the undersigned will recommend that the motions be granted in part and denied in part; all defendants, with the exception of Mayflower Transit, Inc., be dismissed from this action; and plaintiffs' claim under the Carmack Act be calendared for trial by jury as soon as possible, inasmuch as genuine issues of material fact exist as to whether plaintiffs are entitled to the relief they seek.

## FINDINGS AND CONCLUSIONS

### I. Background

The following factual background is drawn from the pleadings in a light most favorable to plaintiffs. It is not intended to bind the court or the parties for trial purposes.

Resolution of this dispute between plaintiffs and a national moving company is governed by the Carmack Amendment to the Interstate Commerce Act. 49 U.S.C. § 14706. In July 1996, plaintiffs, who were relocating from Pennsylvania to North Carolina, hired defendant Mayflow-

er Transit, Inc. ("Mayflower") to transport their household belongings. On July 18, 1996, Mayflower issued a bill of lading for the shipment of plaintiffs' household goods from Pennsylvania to North Carolina. On July 26, 1996, plaintiff Thomas A. Taylor ("Mr.Taylor") signed the bill of lading, which provided that the shipment was accepted by Mayflower for interstate transportation "subject to classifications, tariffs, rules and regulations, including all terms printed or stamped hereon or on the reverse side hereof in effect on the date of issue on this bill of lading." In relevant part, Section 6 of that bill of lading provided, as follows:

> As a condition precedent to recovery, a claim for any loss or damage, injury or delay, must be filed in writing ... within nine (9) months after delivery ... or in the case of failure to make delivery, then within nine (9) months after a reasonable time for delivery has elapsed.... Where a claim is not filed ... thereon in accordance with the foregoing provisions, carrier shall not be liable and such a claim will not be paid.

Mayflower's applicable published tariff, STB HGB 400 L, contains identical language.

In effecting the move for plaintiffs, Mayflower contracted with two of its disclosed household goods agents—defendants Louderback Transportation Company, Inc. ("Louderback") and American Way Moving Systems, Inc. ("American Way"). It is undisputed that Mayflower delivered *some* of plaintiffs' household goods in Gastonia during the first week of August 1996. Based upon that delivery, Mayflower contends that in accordance with federal law and regulations, plaintiffs, as the "shippers" of the goods, had until May 7, 1997 (nine months after actual delivery) to file with Mayflower a claim for loss or damage arising out of the interstate shipment of their household goods.

Plaintiffs and defendants have presented different versions of what followed the first delivery of goods. Such distinction is especially sharp as to the efforts and representations made by and on behalf of Mayflower regarding the attempts to determine the location of plaintiffs' goods which Mayflower "misplaced."

It is undisputed that plaintiffs first notified Mayflower, orally, of receiving damaged household goods soon after the first delivery in early August 1996. Plaintiffs admitted during deposition that they were also aware of at least some missing household goods at that point and communicated that fact to Mayflower. On August 16, 1996, Mayflower's local agent sent plaintiffs a letter enclosing a claim form for them to fill out and return in order to file their claim for damages arising out of the interstate move. The correspondence accompanying the claim form contained the following advisory in bold, capital letters:

**YOU HAVE NINE (9) MONTHS TO FILE A CLAIM ALTHOUGH IT IS ADVISABLE TO FILE YOUR CLAIM AS SOON AS POSSIBLE.**

Rather than return the claim form, plaintiffs sent two letters to Mayflower— the first on February 1, 1997; and the second on February 18, 1997. Both of those letters can best be categorized as describing damage to household goods received. Neither letter provided dollar amounts of the damage or mentioned goods that were never delivered.

On April 28, 1997, plaintiffs submitted to Mayflower the claim form which was provided in August 1996 in response to their initial complaint. That form contained the information that was in their February 1997 letters and specific dollar damages claimed, which totaled $6,509.50. On July 24, 1997, Mayflower received plaintiffs' July 17, 1997, correspondence in which they made a claim for missing household goods they alleged were never delivered to them in North Carolina.

On September 2, 1997, which is undisputedly 13 months after the first delivery of some of plaintiffs' household goods, the plaintiffs sent a certified letter to Mayflower, which provided amounts claimed for items which plaintiffs contended had never been delivered. That correspondence was received by Mayflower on September 5, 1997, and the claim totaled $79,897.40. Mayflower subsequently denied that claim because it was not submitted in writing within nine months of delivery occurring in August 1996.

While there is little, if any, substantive dispute as to what correspondence was sent and when, plaintiffs have proffered evidence which, if believed by a fact finder, could lead to a conclusion that Mayflower, as a matter of equity, cannot assert the nine-month rule in bar of plaintiffs' claims.

While no move is typical, plaintiffs have presented evidence that their move was particularly unusual, inasmuch as their goods were not all located in one place, they were voluminous, and they were comprised not only of the usual trapments of a young family, but also included vast collections of minerals and other rare items. Plaintiffs have presented evidence that the move was initially estimated by Mayflower to cost approximately $11,000, but was later raised to $16,000. As part of the moving process, the movers off-loaded some goods in warehouses in Pennsylvania.

Plaintiffs' affidavits do not dispute the dates when their goods first arrived, but do shed light into why plaintiffs were not able to determine immediately what was damaged, what was misplaced by Mayflower, and what was forever lost in transit. Plaintiffs aver that when Mayflower's driver arrived at their house at approximately 1:00 p.m., he did not have any workers or equipment to assist him with unloading.

Mr. Taylor spent several hours driving around Gastonia with Mayflower's driver hiring day labor and renting equipment, such as hand trucks, to aid unloading. Once that task was accomplished, Mr. Taylor assisted the driver and the hired help unloading the goods until 2:00 a.m. the next day.

It is undisputed that the contract with Mayflower provided that Mayflower was to unload and unpack boxes. The driver and the day laborers, citing the lateness of the hour (2:00 a.m.), refused to unpack the boxes and left the unpacked boxes stacked in plaintiffs' house. Plaintiffs estimate that there were 1,000 boxes, which took them six months to unpack.

Plaintiffs aver that as they were unpacking, they realized many of their goods were broken or damaged and items appeared to be missing. Based upon those discoveries, plaintiffs contacted, orally, Ruth Christiansen, an agent of Mayflower with whom they had theretofore been dealing, and inquired as to what to do about the damaged and missing goods.

The second, and apparently final, shipment of goods arrived on August 17, 1996. That shipment consisted, primarily, of children's furniture and belongings, and those items were immediately unpacked based on the pressing needs of the children.

Plaintiffs have outlined their conversations with Mayflower through its agents. Prior to February 1997, plaintiffs had several conversations with Ms. Christiansen, and they aver that during one of those telephone conversations, she requested that the plaintiffs prepare a list of the damaged goods and submit it to her. At that time, plaintiffs had not completed unpacking their boxes, and in fact did not finish unpacking the delivered boxes until around January of 1997. According to

plaintiffs, they advised Ms. Christiansen that, given the number of boxes to unpack, it was going to take them a very long time to determine what was broken or missing. Plaintiffs aver that while 1,000 boxes were delivered, as many as 75 have never been received.

It is plaintiffs' contention that Ms. Christiansen informed Mrs. Taylor that plaintiffs did not need to take any action at that time with regard to the nondelivered goods. Ms. Christiansen purportedly advised that the goods, most likely, were in a warehouse and that they would be located and delivered in the near future. Ms. Christiansen allegedly stated that she had taken steps and would continue to take steps to locate the nondelivered goods. She advised that such a delay in delivery was not unusual in moves involving off-loads, which is where goods are not, necessarily, delivered on the same truck on which they were originally placed. *See* Taylor Affidavits, at ¶ 10.

Plaintiffs contend that they submitted a list of the damaged goods to Ms. Christiansen, per her request, on February 1, 1997, and supplemented the list on February 18, 1997, in regard to damaged mineral specimens. Debbie Durham, a claims agent with Mayflower, sent letters to plaintiffs on February 25, 1997, and March 27, 1997, requesting that they submit to Ms. Christiansen the amount of monetary damage they were claiming for each damaged item.

In response to that request from Ms. Durham, plaintiffs submitted six pages of itemized claim forms dated April 28, 1997. It is undisputed that on the sixth page of that claim, Mr. Taylor wrote in longhand that some of the items picked up in Pennsylvania had not been delivered to North Carolina and requested that Mayflower check its bills of lading in an effort to locate those items. In response, Mayflower caused Shirley Garner, a claims adjuster, to contact plaintiffs, and plaintiffs contend that Ms. Garner requested that they provide a list of the property which had not yet been delivered in order to assist Mayflower in its efforts to locate the property and to investigate their claim.

Plaintiffs contend that based on previous representations by Ms. Christiansen and the conversation with Ms. Garner, they believed that Mayflower was actively attempting to locate the nondelivered goods, those goods would not be difficult to locate, and they would be delivered in the near future. *See* Taylor Affidavits, at ¶ 10. Ms. Garner requested that the list of nondelivered goods be submitted to Debbie Durham, but did not request that plaintiffs include any other information. On July 17, 1997, plaintiffs submitted a letter and their list of nondelivered property to Ms. Durham. They also provided Ms. Durham with photocopies of the three pages from a "Household Goods Descriptive Inventory" which listed the approximately 75 boxes that had not been delivered. They aver that they included the "Household Goods Descriptive Inventory" to assist Mayflower with what they believed was Mayflower's ongoing effort to investigate and locate their goods. Taylor Affidavits, at ¶ 20, Exhibit E. At the end of the July 17, 1997, letter to Debbie Durham, Mr. Taylor advised that "[a] reasonable amount of time for delivery has elapsed. Awaiting an explanation to the question of the final disposition of this portion of the shipment." Taylor Affidavits, at ¶ 20, Exhibit G.

Plaintiffs state that based upon representations and statements from Mayflower's agents, they believed that the final portion of their shipment would be located and delivered well into mid-1997. They admit that they were aware of the require-

ments in the bill of lading that claims for damaged goods be submitted within nine months of the date of delivery and that claims for nondelivered goods be submitted within nine months after reasonable time for delivery had elapsed. By July 17, 1997, plaintiffs contend that they felt compelled to declare to Mayflower that they believed a reasonable time had then passed for delivery of their goods, despite what they allege were the representations of Mayflower's agent, Ms. Christiansen, that there was no need to be concerned about the nondelivered goods, which were in the process of being located and would be delivered in the near future. Taylor Affidavits, at ¶ 20.

After sending the July 17, 1997, letter, plaintiffs were next contacted by a new adjuster, John Corbin, in late July or early August 1997. Mr. Corbin advised that he had taken over the handling of their claim and had their list of nondelivered goods, but requested that they provide him with the amount they were claiming for each nondelivered item. Before compiling that information, plaintiffs received a letter from Mr. Corbin dated August 15, 1997, in which he advised plaintiffs that their claim had been assigned to "TRS claim service" and instructed them to prepare and have their inventory available for review by TRS.

Plaintiffs aver that based upon such action and request that they thought was responsive to their claim, they believed that TRS had been hired to handle and adjust their claim for the nondelivered goods. Taylor Affidavits, at ¶ 22. Plaintiffs further aver that before TRS was substituted for Mr. Corbin, Mr. Corbin had requested by telephone that plaintiffs prepare an inventory and claimed valuation of the nondelivered goods, and Corbin's letter of August 15, 1997, was to the same effect. Taylor Affidavits, at ¶ 21.

On August 30, 1997, a TRS employee visited plaintiffs' home to evaluate the damaged goods. When plaintiffs attempted to give that employee their itemization of nondelivered goods, the employee advised that he was not there to evaluate that information, which should be submitted directly to John Corbin. Plaintiffs state that they then mailed the itemization and valuation of their nondelivered goods claim to John Corbin on September 2, 1997.

After that submission, plaintiffs heard nothing from Mayflower again until Mrs. Taylor was able to contact Mr. Corbin in November 1997. According to plaintiffs, Mr. Corbin advised that although he now had the plaintiffs' valuations for the nondelivered goods, he would need some type of documentary evidence to support the claimed amounts. After spending hours researching that information, plaintiffs provided Mr. Corbin with complete documentation on December 16, 1997. In response, Mr. Corbin's only comment was that the valuation on one item was high.

In late December 1997, plaintiffs were able to contact Mr. Corbin again and asked about the status of Mayflower's efforts to locate their missing goods. According to plaintiffs, Mr. Corbin advised that his review of the file revealed that no effort of any kind, at any time, had been made to locate or track the plaintiffs' nondelivered goods. Mr. Taylor asked, "Why not?" Mr. Corbin advised that he would immediately contact the movers used and initiate an investigation and search for the plaintiffs' missing goods.

In the December 1997 letter, Mr. Taylor advised that the plaintiffs believed the missing partial shipment would be found in the year preceding. Mr. Taylor avers that this statement was based on the numerous representations from Mayflower and its agents that the property was not missing, it was simply misplaced, Mayflower was

actively attempting to locate it, it would be located, and it would be delivered in the near future.

In early February 1998, plaintiffs retained Daniel C. Marks, counsel herein. Mr. Marks avers that he contacted Mr. Corbin on February 16, 1998, to inquire into the status of plaintiffs' claims and to attempt to determine the reasons for the holdup. Mr. Corbin purportedly advised that, according to his records, no research or investigation at any time had been done into the Taylors' claim for nondelivered goods. He also stated that he was awaiting documentation from the mover to enable him to investigate the plaintiffs' claims for missing goods, Mayflower did not really question liability, and the problem was just miscommunication on his end. Marks Affidavit, at ¶ 5.

During the conversation with Mr. Corbin, Mr. Marks asked him if there were any filing deadlines that the Taylors needed to be aware of. Mr. Corbin stated that there were no filing delays that applied to the Taylors' claim. He further stated that there was a two-year-and-one-day rule, which ran from the last communication on the claim, and that the last communication on the plaintiffs' claim had occurred just a couple of weeks before when Mr. Taylor had advised Corbin that he would be retaining an attorney in the near future. Mr. Corbin advised that the only thing that needed to be done was for him to contact Louderback, the local agent, to investigate what might have happened to the goods. He then stated that he would be back in touch with Mr. Marks in a couple of weeks to discuss the status of that investigation and to attempt to settle the Taylors' claims for the missing goods. Marks Affidavit, at ¶ 6. According to Mr. Marks, Mr. Corbin never called him again regarding his investigation of plaintiffs' claim.

Mr. Marks alleges that he called Mayflower on March 12, 1998, and learned that Rick Whitmire had taken over the handling of the plaintiffs' claim. On June 15, 1998, Mr. Whitmire advised that according to the file, there still had been no investigation into the plaintiffs' claim and no attempts to locate the missing goods or settle the plaintiffs' claim. Marks Affidavit, at ¶ 10. Mr. Whitmire advised that he was turning the claim over to his senior adjuster, Debbie Sasuta, and that she would contact Mr. Marks by letter no later than June 19, 1998. Marks Affidavit, at ¶ 10 & 11. Mrs. Sasuta never contacted Marks.

Instead, Mayflower, through attorney Heather A. Paraino, sent a letter dated June 18, 1998, in which Mayflower took the position that plaintiffs' claim for nondelivered goods was being denied because the claim had not been filed within nine months following the delivery of their shipment.

It is undisputed that defendant Transprotection Service Company is Mayflower's claim service agent. There is also no dispute that defendant United Van Lines, Inc., played no role in any aspect of the plaintiffs' interstate move from Pennsylvania to North Carolina.

## II. Standard

On a motion for summary judgment, the moving party has the burden of production to show that there are no genuine issues for trial. Upon the moving party's meeting that burden, the nonmoving party has the burden of persuasion to establish that there is a genuine issue for trial.

When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. In the language of the Rule, the nonmoving party must

come forward with "specific facts showing that there is a *genuine issue for trial.*" Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving [sic] party, there is no "genuine issue for trial."

*Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citations omitted; emphasis in the original) (quoting Fed.R.Civ.P. 56). There must be more than just a factual dispute; the fact in question must be material and readily identifiable by the substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

By reviewing substantive law, as the undersigned has attempted to do below, the court may determine what matters constitute material facts. *Id.* "Only disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment." *Id.,* at 248, 106 S.Ct. 2505. A dispute about a material fact is "genuine" only if the evidence is such that "a reasonable jury could return a verdict for the nonmoving party." *Id.*

> [T]he court is obliged to credit the factual asseverations contained in the material before it which favor the party resisting summary judgment and to draw inferences favorable to that party if the inferences are reasonable (however improbable they may seem).

*Cole v. Cole,* 633 F.2d 1083, 1092 (4th Cir.1980). Affidavits filed in support of defendants' motions are to be used to determine whether issues of fact exist, not to decide the issues themselves. *United States ex rel. Jones v. Rundle,* 453 F.2d 147 (3d Cir.1971). When resolution of issues of fact depends upon a determination of credibility, summary judgment is improper. *Davis v. Zahradnick,* 600 F.2d 458 (4th Cir.1979).

## III. Discussion

### A. Summary Judgment As to the Disclosed Agents Louderback and American Way

■ In addition to suing Mayflower, plaintiffs have also sued defendants Louderback and American Way, the disclosed household goods agents of Mayflower and the companies which actually moved the goods between Pennsylvania and North Carolina. Even though these "household goods agents" appear to have been primarily responsible for this debacle, federal law provides that if liability is found, Mayflower is liable for the acts and/or omissions of its participating disclosed household goods agents. Title 49, United States Code, Section 13907(a) provides:

> **Carriers responsible for agents.** Each motor carrier providing transportation of household goods shall be responsible for all acts or omissions of any of its transporting agents which relate to the performance of household goods transportation services (including accessorial or terminal services) and which are within the actual or apparent authority of the agent from the carrier or which are ratified by the carrier.

There are no allegations in the complaint or in plaintiffs' response that such agents acted *ultra vires.* As disclosed agents of Mayflower, they are not, as a matter of law, parties to the bill of lading contract and cannot be held liable for damages arising out of any alleged breach. *Werner v. Lawrence Transp. Systems, Inc.,* 52 F.Supp.2d 567 (E.D.N.C.1998). The undersigned, therefore, will recommend that summary judgment be granted as to Defendants Louderback and American Way and that such defendants be dismissed with prejudice from this action.

## B. Summary Judgment as to United Van Lines and Transprotection Service Company

It is undisputed that defendant United Van Lines ("United") played no role in the interstate shipment of the plaintiffs' household goods. It is also undisputed that United is a separate corporate entity from Mayflower and has no responsibility for the debts and obligations of Mayflower. The bill of lading identifies Mayflower, not United, as the carrier of the plaintiffs' interstate shipment of household goods.

Summary judgment should also be entered in favor of Transprotection Services Company ("Transprotection"). The undisputed record evidence is that Transprotection's only role in this transaction was as the claims handling agency for Mayflower. There are no surviving allegations against this defendant, and all remaining allegations in the complaint relate to damage that allegedly occurred during the interstate shipment.

There being no genuine issues of material fact concerning these defendants, and it appearing that such defendants are entitled to entry of judgment as a matter of law, inasmuch as no cognizable claims remain against them, the undersigned will recommend that summary judgment be granted and that United and Transprotection be dismissed from this action with prejudice.

## C. Summary Judgment as to Mayflower

Finally, Mayflower has also moved for partial summary judgment, contending that, as a matter of federal laws and regulations, plaintiffs' substantial claims for nondelivered goods are barred because they failed to submit a written claim within the nine months after a reasonable time had passed for delivery of those goods.

Title 49, Code of Federal Regulation, Parts 370.3, *et seq.,* contains rules promulgated by the Interstate Commerce Commission and establishes what information must be contained in a written claim supplied by a shipper, such as plaintiffs, to a carrier, such as Mayflower, to constitute a "proper claim." Part 370.3(b) provides for the following:

> A written or electronic communication ... from a claimant, filed with a proper carrier within the time limits specified in the bill of lading or contract of carriage or transportation and: (1) containing facts sufficient to identify the baggage, or shipment (or shipments) of property, (2) asserting liability for alleged loss, damage, injury, or delay, and (3) making claim for the payment of a specified or determinable amount of money, shall be considered as sufficient compliance with the provision for filing claims embraced in the bill of lading or other contract of carriage....

To avoid the ill effects (first felt in the last century when a few families controlled most commercial means of interstate transportation) of providing one shipper with more favorable or "prejudicial" terms, federal law prohibits interstate carriers, such as Mayflower, from paying any claim until the shippers, such as plaintiffs, have filed a claim in compliance with the applicable federal regulations.

> [The interstate carrier] shall not voluntarily pay a claim under such circumstances unless and until a formal claim in writing for a specified or determinable amount of money should have been filed in accordance with section (b) of this section.

49 C.F.R., Part 370.3(d). Similar restrictions on departures from posted tariffs apply not only to the movement of household goods in interstate commerce, but across the board to transactions that involve the most sophisticated merchants.

*See Reiter v. Cooper,* 507 U.S. 258, 113 S.Ct. 1213, 122 L.Ed.2d 604 (1993) ("filed rate doctrine" embodies principle that shipper cannot avoid payment of tariff rate by invoking common-law claims and defenses).

Plaintiffs' first claim (for damaged goods) was timely, while their second claim (for nondelivered goods), received by Mayflower on September 5, 1997, was arguably untimely if the nine-month claim period is determined to run from a "reasonable time for delivery" that commenced in August 1996. The Carmack Amendment permits an interstate motor carrier, such as Mayflower, to set a nine-month claim filing deadline in the bill of lading. 49 U.S.C. § 14706(e)(1). It is undisputed that this statutory limitation has been adopted by Mayflower's bill of lading and applicable operating tariff. It is Mayflower's contention that any claim submitted after May 7, 1997, would be untimely under the statute and that plaintiffs' September 5, 1997, claim (the first claim that contained all the necessary elements for nondelivered goods) was nearly four months late.

The point of law concerning the operation of the nine-month bar is conceded by plaintiffs. Plaintiffs' Response, at 9–10. Instead, plaintiffs rely upon a doctrine of equitable tolling, which has developed to allow for departure from the nine-month bar where the delay is caused by acts or omissions on the part of the carrier.

Three primary exceptions have developed to the time delays promulgated by the Carmack Amendment: estoppel; waiver; and inability of the shipper, despite the exercise of reasonable diligence, to ascertain the extent of its loss within the claim filing period. *Nedlloyd Lines v. Harris Transport Co., Inc.,* 922 F.2d 905 (1st Cir. 1991).

### 1. Estoppel and Waiver

### A. Estoppel

Two of these equitable principles, the second and third, are best stated in *Landess v. North American Van Lines, Inc.,* 977 F.Supp. 1274 (E.D.Tex.1997), wherein the district court held:

Unless the shipper complies with the nine month filing requirement, the claim is barred. Courts have fashioned two exceptions to this strict rule, however. These two exceptions are when "(1) the shipper, despite reasonable diligence, is unable to ascertain the extent of its loss within the filing period; or (2) the carrier's conduct misled the shipper into believing that a timely filing was unnecessary." Plaintiffs in this case do not argue that they were unable to ascertain the extent of their loss. They argue only that, if their notices did not satisfy the minimum filing requirements, the second exception of estoppel should apply.

*Id.,* at 1281 *citing Salzstein v. Bekins Van Lines, Inc.,* 993 F.2d 1187 (5th Cir.1993).

In *Landess,* the shippers argued that they were misled by the carrier's tender of a settlement check, the accompanying letter, and the carrier's letter acknowledging that the shippers had declined such tender. It was the shippers' theory that the letters were indicia that no further documentation was needed from them as to what property was destroyed and its value. In determining that the shippers were not entitled to the equitable relief sought because estoppel concentrates on the acts of the carrier, as opposed to what the carrier actually knew, the *Landess* court held:

Estoppel is an equitable remedy that should be relied upon only when the party being estopped has taken some affirmative steps to induce the other party into believing that there was no need to file a claim.

*Id.*, at 1282 *citing Perini–North River Associates v. Chesapeake & O. Ry. Co.*, 562 F.2d 269, 273 (3d Cir.1977).

The minimum filing requirements are found in Part 1005.2(b) of Title 49 of the Code of Federal Regulations, which states that shippers, such as plaintiffs, must submit to the carrier the following:

> A written … communication … filed with the proper carrier within the time limits specified in the bill of lading … and (1) containing facts sufficient to identify the baggage or shipment or shipments of property (2) asserting the liability for alleged loss, damage, injury, or delay, and (3) making claim for the payment of a specified or determinable amount of money, shall be considered as sufficient compliance with the provisions for filing claims.

While the Court of Appeals for the Fourth Circuit has yet to speak to the issue, the courts that have decided the point have found departure from the strict requirements of Part 1005.2(b) would require an affirmative showing on the part of the shipper that the carrier engaged in some "misleading conduct or statement. . . ." *Id.*, at 1283. When asserting equitable tolling, the reliance of the shipper must be reasonable. *Salzstein, supra.*

The court has been presented with two very different versions of what transpired between July 1996 and the filing of this action in 1998. *See* Mayflower's Reply. If the court were to fully credit Mayflower's version, it would appear that Mayflower did everything it could, absent filling out the claim for plaintiffs, to assure that plaintiffs would submit a timely claim. If plaintiffs' version were to be fully credited, it would appear that they were misled by the actions and statements of numerous agents of Mayflower to believe that the goods were misplaced rather than lost and that no claim needed to be filed. Indeed,

plaintiffs' counsel has presented his own affidavit that an agent of Mayflower attempted to mislead him when he came into the case in the fourth quarter.

■ While the truth of the matter usually lies between such extremes, Rule 56 requires this court to consider the facts in a light most favorable to plaintiffs on summary judgment. Plaintiffs have pointed to the following alleged *acts* of defendant to support their theory of equitable estoppel:

> Within a couple of days after the first delivery to their house during the first week of August of 1996, the plaintiffs advised [Mayflower's agent] Ruth Christiansen of the fact that there were both damaged goods and goods that are still not been delivered. Without requesting the same, Michelle Kirgan, claim manager for Buehler–Mayflower, sent a letter on August 16, 1996, to Tom Taylor. (Taylor Affidavits, ¶ 27, Exhibit K). The first sentence of the August 16, 1996 letter indicates that it concerns goods damaged during the move. The content and tone of the entire letter further confirm that it deals only with goods damaged during the move.

> The Taylors never received a similar letter (or claim form) regarding their claim for non-delivered goods. (Taylor Affidavits, ¶ 27).

> The fact that the Taylors did not receive a letter or claim form regarding their non-delivered goods was consistent with their telephone conversations with Ruth Christiansen. The parties discussed the non-delivered goods several times during 1996 and the first part of 1997. Ms. Christiansen asked the Taylors to give Mayflower additional time to deliver the goods. She advised that the goods were not missing or lost, and were most likely simply sitting in a warehouse as a result of the offloading done by Mayflower.

She reassured the Taylors that this was not uncommon with moves involving off-loads. She further reassured the Taylors that it would be a simple process to locate the goods, that she would do so, and that the goods would be delivered to the Taylors in the near future. (Taylor Affidavits, ¶ 10).

In none of these conversations with Ruth Christiansen did she tell the Taylors that any claim they might have with the non-delivered goods had to be filed within nine months. In fact, the Taylors were led to believe that there was no reason for concern or that they had to file a claim within a certain time.

The Taylors were led to believe that there was nothing they should, or could, be doing with respect to their non-delivered goods.

During the conversations with Ruth Christiansen, the Taylors told her that due to the incredible volume of boxes that they had to unpack, that it would take a long period of time to determine the extent of their damaged goods, and even longer to determine what goods had not been delivered with regard to the damaged goods. She requested that the Taylors send her a list of the damaged goods when they had finished unpacking. She did not request that the Taylors send her a list of non-delivered goods. (Taylor Affidavits, ¶ 8, 9, 10). As part of the contract with Mayflower, Mayflower was supposed to unpack the boxes once they were delivered to Gastonia. Instead, the moving company simply unloaded the boxes into the yard and three large rooms in the Taylors' house and stacked the boxes literally from floor to ceiling. The unloading of the boxes was not complete until approximately 2:00 a.m. The Mayflower driver and the day laborers hired to unload the truck refused to perform any more work including unloading the boxes. There-fore, it was left to the Taylors to unload and manage the boxes as best they could (Taylor Affidavits, ¶ 32).

When Debbie Durham apparently took over the handling of the plaintiffs' claim, they received two letters from her, one dated February 25, 1997, and one dated March 27, 1997. Both of these letters referred to documentation that the Taylors had submitted in support of their claim for damaged goods, and contained no mention of the Taylors' non-delivered goods. This continued to lead the Taylors to believe that nothing was required of them in regards to the goods that had still not been delivered.

When the Taylors submitted their claim form on April 28, 1997 for the damaged goods, they noted, on page six of the claim form, that some of their goods still had not been delivered, and requested Mayflower to look for these goods and check the bills of lading. This document would have been received by Mayflower within a day or two. Mayflower could have called and contacted the Taylors and advised them of any additional information it would require for the non-delivered goods, and the Taylors could have attempted to provide this information to Mayflower within the nine month deadline.

The Taylors received no response from Mayflower to its notation on page six regarding the non-delivered goods until they were called by Ms. Shirley Garner, a claims representative with Mayflower in Texas, in late June or early July of 1997. She requested only that the Taylors submit a list of the non-delivered goods to Debbie Durham. She did not state that any other information would be necessary.

The Taylors, in response to this request, did submit an itemized list of non-delivered goods to Debbie Durham on July 17, 1997. In the cover letter along with

this inventory, Tom Taylor advised Ms. Durham that in his opinion "a reasonable amount of time for deliver has elapsed."

Tom Taylor used this language as a direct quote from Mayflower's own bill of lading. The phrase "reasonable amount of time" is ambiguous. In Mr. Taylor's opinion, and based on the conversations with Ruth Christiansen and the letters from Debbie Durham, he had allowed Mayflower reasonable time to locate the non-delivered goods and to deliver them to his house. Case law interpreting the Carmack Amendment seems to equate "reasonable amount of time for delivery" to the amount of time it takes to drive from the shipping site to the delivery site. However, this clearly is not an obvious interpetation of this phrase, and Mr. Taylor's interpretation can certainly be understood in light of the fact that Mr. Taylor is a layperson who is not sophisticated in interstate moves.

Further, the Taylors were led to believe that their interpretation of the phrase "reasonable amount of time for delivery" was correct. During one conversation with Ruth Christiansen, they advised her that in their opinion, six months was a reasonable amount of time to allow for delivery. Ms. Christiansen agreed and said that everything possible was being done to locate the Taylors' goods and to deliver them to them.

Upon receiving the plaintiff's inventory of non-delivered goods in July of 1997, Mayflower repeatedly requested additional information from the Taylors so that it could evaluate the plaintiffs' claim toward settlement.

In July or August of 1997, John Corbin called the plaintiffs and requested that they submit a value on each of the items that were non-delivered.

John Corbin next arranged for an adjusting company, TRS, to come to the plaintiffs' house, and sent a letter to the plaintiffs asking that they "have your inventory available." Since they had just spoke to Mr. Corbin about valuing their non-delivered goods, they assumed that this was the inventory he was referring to. They had been working for several months on valuing the goods and endeavored to complete the valuation of each item as quickly as possible based on Mr. Corbin's telephone request and his written request.

When the adjuster arrived, he advised that he did not want to see the inventory and valuation of the missing goods, and that he was there only to inspect the damaged goods. The Taylors allowed him to inspect the damaged goods. The independent adjuster told the plaintiffs that they should submit their inventory and valuation of the non-delivered goods to Mr. Corbin.

The plaintiffs did submit their inventory and valuation of non-delivered goods to Mr. Corbin on September 2, 1997.

The plaintiffs never heard back from Mr. Corbin or anyone at Mayflower. They attempted repeatedly to call Mr. Corbin, and left numerous voice mails, none of which were returned.

They finally got through to Mr. Corbin during the third week of November, 1997. At that time, Mr. Corbin advised that he had no way of judging whether the plaintiffs valuations for the non-delivered goods were accurate or reasonable. The plaintiffs advised that they would provide this documentation to Mr. Corbin, and advised that this had never been requested before.

The Taylors provided substantial documentation of their valuations to Mr. Corbin with a letter dated December 16, 1997.

The Taylors never heard from Mr. Corbin or Mayflower as to whether their claim was accepted, denied, or what the status of the claim was.

Daniel C. Marks contacted John Corbin on February 16, 1998. Mr. Marks inquired as to what the problem or the holdup was in the resolution of the Taylors' claim. Mr. Corbin responded that it appeared that absolutely no investigation or work had been done toward evaluating the plaintiffs' claim or attempting to locate the plaintiffs goods. Mr. Marks next asked Mr. Corbin who he thought was to blame for the disappearance of the plaintiffs' goods. Mr. Corbin responded by stating that "we don't really contest liability. It's just mis-communication on my part." Finally, Mr. Marks asked Mr. Corbin if he knew of any filing deadlines or requirements that were applicable to the Taylors claim. He responded by saying that there were none, and that the only filing delay was a two year and one day rule, which ran from the last date of communication about the claim.

The defendants never accepted or denied, or took any position at all, on the plaintiffs' claim for non-delivered goods until Heather Paraino sent a letter dated June 18, 1998 to Mr. Marks in which Mayflower attempted to deny the plaintiffs' claim for non-delivered goods based on the nine month rule.

A carrier is required to acknowledge receipt of a claim within 30 days of receiving the same. 49 C.F.R. § 1005.3(a). Even using September 2, 1997, as the date the claim was filed, the defendants were required to acknowledge receipt of the claim by October 2, 1997. The Defendants did not do so.

\*   \*   \*   \*   \*   \*

Further, a carrier is required to pay, decline, or make a firm settlement offer in writing to a claim within 120 days after receipt of a claim. 49 C.F.R. § 1005.5. Again using September 2, 1997 as the filing date, the defendant's response was due in writing by December 31, 1997. The Defendant's did not do so.

This was the Taylors first interstate move, and as such were naive and inexperienced in the claims process as compared to the defendants.

Since shortly after their move in August of 1996, the plaintiffs were repeatedly assured, initially by Ruth Christiansen, and later by the numerous other adjusters to whom their claims had been transferred, that investigation was underway to track and locate the plaintiffs' non-delivered goods, that the goods would be located and delivered, that this type of delay was not unusual when an offload was involved, and otherwise led to believe that Mayflower and the defendants were actively engaged in an effort to locate the plaintiffs' goods. In December of 1997, John Corbin admitted to Tom Taylor, and in February of 1998 admitted to Daniel Marks, that the defendants had done absolutely nothing toward investigating and attempting to locate the plaintiffs' missing goods or to investigate the plaintiffs' claim.

Plaintiffs' Brief in Opposition to Defendants' Motion for Summary Judgment, at 13–19 (errors in original).

Clearly, plaintiffs have thrown everything at this argument, and much of what they have submitted is not relevant to the estoppel inquiry. Most important to the undersigned are the alleged statements of Ms. Christiansen concerning the calculation of a reasonable time for delivery; alleged assurances from Mayflower's agents

that the goods were not lost, only misplaced; and the allegedly false representation that efforts were underway to find the goods. As discussed above, some reasonable detrimental reliance must be shown, in addition to the acts of Mayflower, for equitable estoppel to apply. In this case, it would appear that plaintiffs concentrated on unpacking boxes (which was allegedly supposed to have been done by Mayflower in accordance with the contract) and documenting what was missing, in hopes of aiding in Mayflower's search for the missing boxes, rather than valuing the goods in an effort to seek recovery of damages.

Based upon the pleadings now before the court, a genuine issue of material fact exists as to whether (1) Mayflower engaged in the "misleading conduct or statement[s] ..." which plaintiffs attribute to it by and through its agents; (2) plaintiffs' reliance on such statements was reasonable; and (3) plaintiffs' reliance was detrimental to the prosecution of their second claim. While Mayflower has presented evidence that plaintiffs failed to comply with the Carmack Amendment, plaintiffs have presented evidence upon which a reasonable finder of fact could find in their favor on the issue of equitable estoppel. To that end, the undersigned must recommend to the district court that Mayflower's Motion for Partial Summary Judgment as to the second claim for nondelivered household goods be denied.

## 2. Waiver

■ Plaintiffs have also argued the equitable remedy of waiver. Waiver involves the voluntary or intentional surrender of a known right. *Salzstein, supra,* at 1191. There is no evidence before the court that would support a jury finding of waiver.

## B. Loss Could Not Be Determined Within Filing Period

Plaintiffs have also argued that the nine-month period should be tolled because despite reasonable diligence on their part, they were unable to ascertain the extent of their loss within the filing period. Such is the third and final exception to the Carmack Amendment. *Pathway Bellows, Inc. v. Blanchette,* 630 F.2d 900 (2d Cir.1980).

■ To determine what was missing, plaintiffs had to first determine what they had received. If plaintiffs' version of events is to believed (which it must on summary judgment), they had contracted with Mayflower to assist not just in the move, but with the unpacking. There were approximately 1,000 boxes plaintiffs had to unpack, and they contend they did so as diligently as was humanly possible. Any delay, they argue, was attributable to Mayflower. Plaintiffs further contend that a period of nine months, six of which were taken up solely by the unpacking of all the boxes, was insufficient for them to completely ascertain and document the extent of their loss. While nine months would be sufficient for the ordinary shipper of household goods to determine loss, Mayflower has not countered plaintiffs' argument as to the massive number of boxes that were moved. Of interest would have been evidence from Mayflower concerning the average number of boxes in an interstate household move. To that end, the court finds that plaintiffs have presented sufficient evidence to survive summary judgment as to the equitable exception of nine months being an inadequate time to determine the extent of their loss, with the ultimate decision thereon being vested with the finder of fact. The undersigned, therefore, will recommend to the district court that Mayflower's Motion for Partial Summary Judgment be denied on the alternative basis of a genuine issue of material fact remaining as to this equitable exception to the Carmack Amendment.

**666**

## RECOMMENDATION

**IT IS, THEREFORE, RESPECTFULLY RECOMMENDED** that defendants' Motion for Summary Judgment and Partial Summary Judgment be **GRANTED** in part and **DENIED** in part as follows:

(1) defendants' Motion for Summary Judgment as to defendants **UNITED VAN LINES, INC., LOUDERBACK TRANSPORTATION COMPANY, INC., AMERICAN WAY MOVING SYSTEMS, INC., and TRANSPROTECTION SERVICE COMPANY,** be **GRANTED** and those defendants be **DISMISSED** from this action **WITH PREJUDICE** for the reasons discussed *supra*; and

(2) remaining defendant **MAYFLOWER TRANSIT, INC.'s** Motion for Partial Summary Judgment on plaintiffs' claim for nondelivery of household goods be **DENIED** without prejudice as to reassertion at the close of plaintiffs' evidence. Such recommendation is based only upon the finding of the undersigned that plaintiffs' proffer of evidence and arguments creates genuine issues of material fact as to the equitable exceptions to the Carmack Amendment of estoppel and inability to determine the claim within the time provided, with the further recommendation that summary judgment be **GRANTED** in favor of Mayflower on the equitable exception of waiver.

The parties are hereby advised that, pursuant to 28, United States Code, Section 636(b)(1)(C), written objections to the findings of fact, conclusions of law, and recommendation contained herein must be filed within ten (10) days of service of same. Failure to file objections to this Memorandum and Recommendation with the district court will preclude the parties from raising such objections on appeal.

*Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985), *reh'g denied,* 474 U.S. 1111, 106 S.Ct. 899, 88 L.Ed.2d 933 (1986); *United States v. Schronce,* 727 F.2d 91 (4th Cir.), *cert. denied,* 467 U.S. 1208, 104 S.Ct. 2395, 81 L.Ed.2d 352 (1984).

This Memorandum and Recommendation is entered in response to defendants' Motion for Summary Judgment and Partial Summary Judgment (# 19).